**Anthony Dewayne MITCHELL also known as Mustafa B. Shabazz, Plaintiff–Appellee,**

v.

**Clarence DUPNIK, Sheriff of Pima County, Defendant–Appellant.**

**Anthony Dewayne MITCHELL, Plaintiff–Appellee,**

v.

**Clarence DUPNIK, Defendant,**

**Donald Robare and Michael Garland, Defendants–Appellants.**

**Anthony Dewayne MITCHELL, Plaintiff–Appellee,**

v.

**Clarence DUPNIK, Defendant–Appellant,**

**David Bosman and Richard Fimbres, Defendants–Appellants.**

Nos. 93–16517, 93–16955 and 93–17019.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1995.

Filed Sept. 28, 1995.

Opinion Withdrawn Jan. 26, 1996.

Opinion Filed Jan. 26, 1996.

Mustafa B. Shabazz, Arizona State Penitentiary, Florence, Arizona, in pro. per.

Gerald Maltz, Miller, Pitt and McAnally, Tucson, Arizona, for defendants-appellants.

Gerard M. Guerin, Deputy County Attorney, Tucson, Arizona, for defendants-appellants.

## ORDER

The motion of Shabazz to file a late response to the County defendants' petition for rehearing is GRANTED. Shabazz's response is ordered filed.

Shabazz's motion to strike the affidavit appended to the County defendants' petition for rehearing is GRANTED. The affidavit is stricken.

The opinion of this court filed on September 28, 1995, and reported at 67 F.3d 216 is withdrawn, and the attached opinion is substituted therefor.

With the filing of this opinion, the panel has unanimously voted to deny the petition of the County defendants for rehearing and to

reject their suggestion for rehearing en banc. The petition for rehearing of the County defendants is denied. The County defendants' suggestion for rehearing en banc has been circulated to the full court and no member of the court has called for a vote to rehear the case en banc. The County defendants suggestion for rehearing en banc is rejected.

Appeals from the United States District Court for the District of Arizona.

Before: CHOY, CANBY, and T.G. NELSON, Circuit Judges.

## OPINION

CANBY, Circuit Judge:

Pima County Sheriff Clarence Dupnik and several of his deputies appeal a series of district court judgments and orders in favor of prisoner Mustafa B. Shabazz, formerly known as Anthony D. Mitchell, resulting from multiple actions that Shabazz had brought under 42 U.S.C. § 1983. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

### I. Appeal No. 93–16955

Shabazz was held in the Pima County Adult Correction Center ("the Jail") from February 1991, to September 1992, during the pendency of his trial on criminal charges not at issue here. Shabazz was apparently a somewhat disruptive prisoner, and as a result he spent significant disciplinary time in the "administration segregation" wing of the Jail. Inmates in administrative segregation are subject to substantially greater restrictions than is the general Jail population.

While at the Jail, Shabazz instituted two actions under § 1983 that are the subject of these appeals. His first action alleged numerous violations of his constitutional rights. The district court later dismissed all but two of the claims of this first lawsuit.

The first of those surviving claims alleged that Donald Robare, a corrections officer at the Jail, violated the Due Process Clause of the Fourteenth Amendment by failing to ob- serve several required procedural safeguards while conducting three separate disciplinary proceedings against Shabazz. Specifically, the complaint alleged that: (1) Robare failed to tape record at least one of the proceedings, in violation of published Jail policy; (2) Robare refused to allow Shabazz to call witnesses at the proceedings, again in contravention of Jail policy; and (3) Robare did not deliver to Shabazz written copies of the findings in each proceeding, which was required by Jail policy. Shabazz contended that the alleged violations resulted in his unjustified assignment to nineteen days of segregation.

Robare moved to dismiss the claim, but the court determined that most or all issues were disputed, and instead ordered the Jail to re- conduct the three hearings with the necessary safeguards in place and to resentence Shabazz accordingly. After rehearing, Shabazz received seven fewer days in segregation than in his original sentence. Because Shabazz had already served the longer sentence, no additional segregation was warranted. Upon Shabazz's motion, the district court granted summary judgment on the issue of Robare's liability and set trial for damages.

Shabazz's second surviving claim from this first action alleged that Michael Garland, also a corrections officer at the Jail, interfered with a constitutionally protected liberty interest by searching Shabazz's legal papers while he was not present, in knowing violation of published Jail policy. Upon Shabazz's motion, the court also granted summary judgment against Garland on the issue of liability and set a trial to determine damages.

After separate trials, the district court entered judgments awarding Shabazz $1000 in damages against Robare and $550 in damages against Garland, in their individual capacities.

### II. Appeal No. 93–17019

While still at the Jail, Shabazz filed a second action under section 1983 against Sheriff Dupnik, Major David Bosman, the Jail's corrections commander, Richard Fimbres, the Supervisor of Discipline at the Jail, and six other sheriff's deputies. The com-

plaint alleged nine separate constitutional violations, all dealing with the disciplinary system in the administrative segregation wing. On defendants' motion, the court ultimately dismissed all but two claims, against Dupnik, Bosman and Fimbres collectively ("the Sheriff").

Shabazz's first claim in this second § 1983 action alleged that the Sheriff's de facto policy denying inmates the right to call and examine witnesses during their disciplinary hearings violated due process. In his second claim, Shabazz alleged that the Sheriff deprived him of a protected liberty interest without due process by failing to provide him, after his hearings were completed, with copies of the disciplinary committee's findings indicating whether an impartial reviewing staff member concurred in the findings.

Shabazz moved for and was granted summary judgment on the issue of liability as to all three defendants on both claims in this second action. After a bench trial on the issue of damages accruing from the first claim, the district court awarded Shabazz $4,500 in compensatory damages and $100,-000 in punitive damages against the three defendants in their official capacities.[1] On the second claim, the court awarded Shabazz $250 in compensatory damages against each defendant in his individual capacity.

### III. Appeal No. 93–16517

Shabazz prosecuted the above two § 1983 actions *in propria persona,* and thus required use of the Jail's law library facilities, including its reporters and its photocopying services. During the substantial portions of his pretrial detention that Shabazz spent in administrative segregation, he was not permitted to leave his cell to spend time in the Jail's law library.

The library serves segregated inmates through a paging system in which the inmates can order up to five legal books twice per week. The paging system is not rigid in

that, under "special circumstances," inmates may request and receive in excess of five books at a time. Additionally, a library staff person is available on a limited basis to assist with an inmate's legal research.

Shabazz moved during the course of his actions to compel the Jail to provide greater access to legal materials, photocopying and carbon paper. On July 15, 1992, the district court denied Shabazz's motion, but issued an injunction ordering the Jail to publish its legal access policy, including the process by which it evaluated requests for exception to the paging system limits for segregated inmates. Dupnik complied in September of 1992. Also in September, the state moved the now-convicted Shabazz from the Jail to Florence State Correctional Facility to serve his criminal sentence.

On October 6, 1992, the district court issued another order finding the Jail's then-recently published policy to be constitutionally inadequate. The policy did not explain the factors that Jail authorities would consider in determining whether to grant exceptions to book and delivery-time limits for segregated inmates. The court again ordered the Jail to publish a satisfactory policy.[2] After an evidentiary hearing, the district court on March 17, 1993, issued its final order finding the Jail's second attempt at formulating a library access policy to be inadequate. The court cured the inadequacy by writing the Jail's "exceptions" policy itself in an injunction.

### ANALYSIS

We review de novo the district court's grant of summary judgment. *Jesinger v. Nev. Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* Because there is an overlap of the claims in Shabazz's two

---

1. The court also ordered, however, that the Sheriff could recoup all punitive damages if he amended Jail policy, practice and training to eliminate the constitutional violations pertaining to the calling of witnesses in inmate disciplinary proceedings.

2. The October 6, 1992 order was later withdrawn in contemplation of an evidentiary hearing on the constitutionality of the Jail's library access policy for segregated inmates.

actions, we address the issues on appeal by subject matter category, deviating from the order in which Shabazz brought the claims.

## I. The Search of Shabazz's Legal Papers.

 Shabazz contends that Garland violated his constitutional rights by refusing to allow Shabazz to be present while his cell, including his legal materials, was searched. An inmate ordinarily has no reasonable expectation of privacy as to his jail cell or his possessions within it. *Hudson v. Palmer,* 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3199–3200, 82 L.Ed.2d 393 (1984). Thus, even a pretrial detainee has no Fourth Amendment right to be present during a search of his cell. *Bell v. Wolfish,* 441 U.S. 520, 555–57, 99 S.Ct. 1861, 1882–83, 60 L.Ed.2d 447 (1979). Shabazz relies, however, on the proposition that a jail regulation may create a constitutionally protected liberty interest. *See, e.g., Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983).

The Jail's published policy on cell searches provides that

> For the security and safety of inmates and staff, we will, on occasion, find it necessary to conduct an unannounced inspection of your pod and assigned cell. . . . Inmates do not have the right to be present during an inspection of any item *except bona fide legal papers.*

(emphasis added). Shabazz alleged that the above policy created a protected liberty interest in his being present during any search of his legal papers. The district court agreed, and granted summary judgment against Garland on the issue of liability. We now reverse.

Our prior cases held that a state prison regulation created a liberty interest only when it "contain[ed] 'substantive predicates' governing an official's decision regarding a matter directly related to the individual," and when it used " 'explicitly mandatory language' specifying the outcome that *must* be reached upon a finding that the substantive predicates have been met." *Dix v. County of Shasta,* 963 F.2d 1296, 1299 (9th Cir.1992) (quoting *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989)). It

was on this approach that the parties based their arguments during the appeal of this issue.

The Supreme Court has since adopted a new approach to determining when prison regulations create a liberty interest. In *Sandin v. Conner,* ── U.S. ──, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the court criticized the substantive predicates approach, noting that by using it, courts had "ceased to examine the 'nature' of the interest" purported to be created by the State, in favor of a mechanical exercise in parsing individual prison regulations to look for magic words:

> By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not on the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. Courts have, in response, and not altogether illogically, drawn negative inferences from mandatory language in the text of prison regulations . . . [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause.

*Id.* at ── – ──, 115 S.Ct. at 2299–2300; *see also Mujahid v. Meyer,* 59 F.3d 931, 932 (9th Cir.1995) (outlining the "substantive predicates" approach and recognizing its rejection by *Sandin* ).

*Sandin* consequently refocused the test for determining the existence of a liberty interest away from the wording of prison regulations and toward an examination of the hardship caused by the prison's challenged action relative to "the basic conditions" of life as a prisoner. *See id.* at ──, 115 S.Ct. at 2301. The Court reformulated the working definition of a liberty interest in the present context to include only "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ──, 115 S.Ct. at 2300.

■ As we point out below in connection with Shabazz's claims relating to the imposition of disciplinary segregation, the *Sandin* reference to "ordinary incidents of prison life" refers to the ordinary incidents of imprisonment under a sentence after conviction. Shabazz was a pretrial detainee. In the context of the search of Shabazz's cell, however, we conclude that this fact makes no material difference. The cell search is not imposed as punishment and does not involve a more restrictive level of incarceration to which a sentence is relevant; it is a general security measure of the kind that the Supreme Court has said pretrial detainees may be subjected. *See Bell v. Wolfish,* 441 U.S. at 546–47 & n. 28, 99 S.Ct. at 1877–78 & n. 28. Thus we conclude that it is appropriate to apply *Sandin* to Shabazz's cell-search claim.

Under *Sandin,* there is little to Shabazz's claim. It is true that Garland violated a Jail regulation that provides for inmates to be present when their legal papers are searched. Shabazz, his cell and all of his other possessions, however, were already subject to inspection at any time and for any or no reason. The failure to permit Shabazz to be present adds no unconstitutional dimension to the practice under *Sandin's* test. The Supreme Court has previously held that a pretrial detainee has no Fourth Amendment right to be present when his cell and belongings in it are searched. *Bell v. Wolfish,* 441 U.S. at 555–57, 99 S.Ct. at 1882–83. Thus the inspection of Shabazz's legal papers in his absence is simply not a dramatic departure from the basic conditions of his incarceration, even in his status as a pretrial detainee. We hold that the violation of this regulation does not "present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. We therefore reverse the district court's judgment against Garland.

## II. The Prohibition of Witness Testimony During Disciplinary Proceedings in the Administrative Segregation Wing.

■ Shabazz contends that the Jail's witness policy for disciplinary hearings violated his right to due process of law. The defendants argue, however, that Shabazz's due process rights could not have been violated because, under the Supreme Court's decision in *Sandin,* he had no liberty interest in being free from disciplinary segregation. The County defendants' argument overlooks one fact that is crucial in the context of segregation imposed as disciplinary punishment: Shabazz was a pretrial detainee, not a convicted prisoner.

■ In *Sandin,* the Supreme Court held that an incarcerated prisoner had no liberty interest in being free from segregated confinement imposed as a disciplinary measure. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301; *see also Mujahid v. Meyer,* 59 F.3d at 932 (applying *Sandin*). It is important to understand, however, the rationale underlying *Sandin's* ruling with regard to disciplinary segregation. The Court there stated:

Discipline by prison officials in response to a wide range of misconduct falls within the *expected parameters of the sentence imposed by a court of law.*

*Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. (emphasis added). Again, in summarizing its holding, the Court announced:

We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff [v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)]. The regime to which he was subjected as a result of the misconduct hearing *was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.*

*Id.* at ——, 115 S.Ct. at 2302 (emphasis added). Thus a convicted prisoner simply has no liberty interest in freedom from increased restraint unless the restraint "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," or the state has conferred a liberty interest from confinement conditions "impos[ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300.

None of this rationale applies, however, to a pretrial detainee like Shabazz, who had not been convicted or sentenced at the time he was disciplined. Indeed, *Sandin* made the distinction itself, in refuting Conner's argument "that any state action taken for a punitive reason encroaches on a liberty interest." *Id.* Conner had relied on *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which *Sandin* distinguished as follows:

> *Bell* dealt with the interests of pretrial detainees and not convicted prisoners.... The Court in *Bell* correctly noted that a detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." The Court expressed concern that a State would attempt to punish a detainee for the crime for which he was indicted via preconviction holding conditions. Such a course would improperly extend the legitimate reasons for which such persons are detained—to ensure their presence at trial.

*Sandin,* —— U.S. at ——, 115 S.Ct. at 2300 (citations omitted).

*Sandin* thus recognizes that its rationale regarding incarcerated prisoners is not applicable to pretrial detainees. *Sandin* leaves *Bell v. Wolfish* untouched. *Bell* involved a challenge by pretrial detainees to general jail conditions, asserting that they amounted to the imposition of punishment prior to conviction. The Supreme Court concluded that the conditions did not amount to punishment, and therefore did not infringe the detainees' liberty interest under the Due Process Clause. But the Court left no doubt that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S. at 535, 99 S.Ct. at 1872.

Because the plaintiffs in *Bell* were challenging general jail conditions, that case turned on whether the conditions were so severe that they could constitute "punishment" for the crimes that had led to the pretrial detention. Shabazz's challenge is different; he challenges disciplinary segregation. That segregation was not imposed as punishment for the crime that led to Shabazz's pretrial detention; it was imposed as punishment for violation of jail rules or policies. That fact makes no analytical difference, however. Indeed, Shabazz's case is easier than *Bell* in one regard: there can be no question that the purpose and effect of Shabazz's segregated confinement was punishment. The central principal of *Bell* applies: Shabazz as a pretrial detainee may not be punished without a due process hearing.

*United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), provides further support for the right of pretrial detainees to a due process hearing before they are restrained for reasons other than to assure their appearance at trial. *Salerno* upheld the provision of the Bail Reform Act permitting pretrial detention of persons found dangerous to the community. The Court held that detention for dangerousness was not punishment, and that such detention did not violate the due process clause because of the rigorous procedures attending such detention, including a full adversary hearing before an impartial officer. *Id.* at 751–52, 107 S.Ct. at 2103–04.

Thus nothing about Shabazz's status as a pretrial detainee deprived him of the liberty interest in not being punished without due process.[3] This conclusion does not mean that pretrial detainees are free to violate jail rules with impunity. Indeed, *Bell* recognizes the need for preserving "internal order and discipline" among pretrial detainees as well as convicted prisoners. *Bell,* 441 U.S. at 546, 99 S.Ct. at 1877. Our conclusion does mean, however, that pretrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule.[4] The

---

3. *Bell* saw no reason to distinguish between pretrial detainees and convicted prisoners with regard to the general *security practices applicable* to inmates. *Bell,* 441 U.S. at 546–47 & n. 28, 99 S.Ct. at 1877–78 & n. 28. Nothing in that position negates the need for a due process hearing when punishment is imposed on pretrial detainees, however.

4. Indeed, a due process hearing helps to ensure that disciplinary punishment is what it purports to be, rather than punishment in advance of conviction for the crime that led to detention—the evil condemned by *Bell.*

detainees have no sentences to encompass such disciplinary confinement.

■ The elements of due process in a prison disciplinary hearing have long been established by *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which the district court properly applied in determining that the Jail's witness policy violated Shabazz's constitutional right. *Wolff* requires that jail authorities allow an inmate who faces disciplinary proceedings and whose liberty interest is threatened to call witnesses in his defense, when permitting him to do so will not be unduly hazardous to institutional safety and correctional concerns. *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979. The Jail's published policy on disciplinary hearings appears to comport with *Wolff*'s requirement. The policy states that an inmate charged with a major rule violation "may call witnesses, but if not practical for safety or security reasons, you may be asked to submit questions you want asked of them. Witnesses may be other inmates or staff members."

■ The district court found, however, that in practice the Jail followed a blanket policy of prohibiting inmates from calling any witnesses under any circumstances to testify at disciplinary hearings. Instead, Jail officials always exercised their option to have the inmate identify his witnesses and pose written questions to them. The officers would then later conduct remote witness interviews, the results of which were incorporated into the material considered by the disciplinary hearing committee when it decided the inmate's case. It is the Sheriff's position that this procedure constitutes the "calling of witnesses," and satisfies *Wolff.*

We have previously held that a blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible, even where jail authorities provide for interviewing of witnesses outside the disciplinary procedure. In *Bartholomew v. Watson,* 665 F.2d 915 (9th Cir.1982),[5] which involved facts nearly identical to those of the present case, we acknowledged that *Wolff* does not require jail officials to afford inmates an unrestricted right to call witnesses. Nor does it require officials to state their reasons for refusing to call a witness, although the Court would deem such notice useful. *Id.* at 918. However, *Wolff* does require that

> the decision to preclude the calling of a witness should be made on a case-by-case analysis of the potential hazards which may flow from the calling of a particular person.... A blanket proscription against the calling of certain types of witnesses in all cases involving institutional security is an overreaction which violates minimal due process.

*Id.*

The district court found that, despite its written policy, the Jail did not evaluate inmate requests to call witnesses on a case-by-case basis. On the basis of that finding, the court correctly applied *Wolff* and *Bartholomew* to conclude that the Jail's *de facto* policy of not calling witnesses did not meet the requirements of due process. Because Shabazz as a pretrial detainee retained a liberty interest in freedom from disciplinary confinement without due process, the court properly granted summary judgment on the issue of the Sheriff's liability for violating Shabazz's rights.

*Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), from which the Sheriff quotes at length, involves a different issue. The Sheriff relies on language in that opinion concluding that due process does not require a jail to allow an inmate to confront and cross-examine witnesses. *Id.,* 425 U.S. at 322–23, 96 S.Ct. at 1560. That assertion is undisputed. It is also irrelevant.

---

**5.** Appellants' treatment of this case in their "Joint Supplemental Opening Brief" is less than accurate. They attempt to distinguish and dismiss *Bartholomew* by implying that there, inmates involved in disciplinary hearings could present no testimonial evidence whatsoever, either by calling witnesses in person or by identifying witnesses for outside interview. In *Bar-* *tholomew,* however, as in the present case, the inmates were prohibited from calling live witnesses at the proceeding but were permitted to submit written questions to inmate or staff witnesses. *Bartholomew,* 665 F.2d at 917–18. We held the prison's policy unconstitutional. *Id.* at 918.

The witnesses at issue in *Baxter,* and in the portion of *Wolff* that *Baxter* analyzed, were prosecution witnesses, and not the inmate's witnesses. An entirely different balancing of concerns applied to confrontation and cross-examination of those witnesses: greater likelihood of hostility and resentment between the accused and the witness, which would erode discipline and threaten corrective aims; lengthening of the proceedings; and a lesser due process interest for the inmate in confronting these witnesses than in calling his own to provide exculpatory evidence. *See Baxter,* 425 U.S. at 322–23, 96 S.Ct. at 1560; *Wolff,* 418 U.S. at 561–64, 568–69, 94 S.Ct. at 2977–78, 2980–81. The *Baxter* Court, as well as the *Wolff* Court, determined that on this issue the balance tipped in favor of the prison authorities' concerns for pursuing their safety and correctional goals. *Baxter,* 425 U.S. at 324, 96 S.Ct. at 1560–61; *Wolff,* 418 U.S. at 567–68, 94 S.Ct. at 2980. Those concerns, and that balance, do not apply to the present case, in which Shabazz sought to call his own witnesses.

### III. Tape Recordings of the Disciplinary Hearings.

■ One further claim of Shabazz relates to due process in imposing disciplinary segregation. In his claim against Robare, Shabazz alleged that the deputy violated his Fourteenth Amendment right to Due Process in three ways: 1) Robare failed to tape record one of the three disciplinary hearings in issue; 2) Robare did not allow Shabazz to call witnesses at the hearings; and 3) Robare did not deliver to Shabazz written findings of the disciplinary committee for the hearings. Each alleged action violated published Jail policy. *Wolff,* as we have said above, requires that Shabazz be allowed to call witnesses unless security reasons preclude it in the particular case. *Wolff* also requires a written statement of reasons for disciplinary action. *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978.

The district court ordered rehearings in all three disciplinary matters, with the appropriate safeguards observed. After the rehearing and upon resentencing, Shabazz received seven fewer days segregation on the same charges. Thereafter, the court granted summary judgment to Shabazz on the issue of Robare's liability for violating Shabazz's due process rights. The court, however, did not specify the facts upon which it based its judgment. On review, we can discern no valid combination of undisputed facts and applicable law upon which the district court could properly grant Shabazz's motion for summary judgment.

The court could not base its summary judgment on Robare's failure to allow witnesses or to deliver written findings in Shabazz's hearings, because genuine factual disputes existed in both of those matters. *See Jesinger,* 24 F.3d at 1130. Robare declared that Shabazz never asked to call any witnesses, and that as a matter of habit Robare delivers written findings from disciplinary hearings to the affected inmates.

The only undisputed fact was Robare's admitted failure to tape record one of the three hearings. Although the district court's Order is unclear, its only factually sustainable basis for ordering summary judgment was a conclusion that Robare's undisputed failure to record the one hearing violated the Constitution, and that, but for the violation, Shabazz would not have suffered the additional days of segregation. In this determination of causation, the district court erred.

It is unclear to us how a recording of Shabazz's hearing could have led to a shorter sentence. While such a recording would have facilitated later review of the proceedings for error, its presence or absence would not affect the fact or duration of punishment initially meted out to Shabazz in the way that, for example, a refusal to allow Shabazz to present exculpatory witnesses or testimony might. The district court admitted that causation on this issue was speculative, and we agree.

Viewing all of the evidence in the light most favorable to Robare, as we must, we conclude that the district court erred in finding a sufficient showing of causation. We also conclude that triable issues exist whether Shabazz was prevented from calling witnesses and was not given a statement of reasons for decision. We reverse the sum-

mary judgment against Robare and remand for further proceedings on this claim.

## IV. Punitive Damages Against Defendants in an Official Capacity.

██ In addition to its grant of compensatory damages in Shabazz's second successful section 1983 action, the district court awarded punitive damages against Dupnik, Bosman and Fimbres in their official capacities in the amount of $100,000. This portion of the award is contrary to law, and we reverse it.

██ Although a municipality may be liable for compensatory damages in § 1983 actions, it is immune from punitive damages under the statute. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). "A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991). The district court's award of $100,000 in punitive damages against Dupnik, Bosman and Fimbres in their official capacities is in reality an assessment against the county, which is immune from such damages.[6] The district court therefore erred in awarding punitive damages.

██ Dupnik also argues, incorrectly, that he is immune from judgment for compensatory damages assessed against him in his official capacity. *City of Newport* does not save municipalities from liability under Section 1983 for compensatory damages. 453 U.S. at 259, 101 S.Ct. at 2755. That liability extends through *Larez* to municipal officers, including Dupnik, Bosman and Fimbres. We affirm the district court's award of compensatory damages.

## V. The Federal Monitor's Findings and the Best Evidence Rule.

██ We review evidentiary rulings for an abuse of discretion, and will not reverse ab-

sent some prejudice. *Roberts v. College of the Desert,* 870 F.2d 1411, 1418 (9th Cir. 1989).

In previous unrelated litigation, the district court had appointed a Master to review the Jail's procedures and operations for compliance with constitutional and other mandates. The Master had made findings as to the acceptability of the Jail's procedures, including its disciplinary hearing procedures. During trial and over Shabazz's objection, the court excluded some of Fimbres' proposed testimony pertaining to those findings. The court ruled that under Fed.R.Evid. 1002, the best evidence of the Master's evaluation of procedures would be the findings themselves.

██ The court concluded that the testimony was offered to prove the content of the findings, and that the "best evidence rule" should therefore apply. That ruling is defensible. Fimbres asserts, however, that he offered the testimony for a different purpose: to show his good faith in enforcing rules that the Master had not criticized. Good faith, however, is only relevant for purposes of punitive damages.[7] In Section IV, we determined that defendants are immune from punitive damages in their official capacities, and we reversed the district court's award of those damages. The "best evidence" issue is therefore moot.

## VI. The October, 1992 and March, 1993 Injunctions and Mootness.

██ The Sheriff argues that Shabazz's claims for injunctive relief pertaining to publication and content of the Jail's library access policy are moot. We review *de novo* questions of mootness. *Aiona v. Judiciary of State of Hawaii,* 17 F.3d 1244, 1246 (9th Cir.1994).

The district court's jurisdiction depends of course upon the existence of a live "case or

---

6. *See also* Arizona Revised Statutes § 12–820.04, which provides:

> Punitive and exemplary damages; immunity
> Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages.

7. "A jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County,* 927 F.2d 1473, 1485 (9th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991).

controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). The court has no authority to decide " 'questions that cannot affect the rights of litigants in the case before [it].' " *DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (citing *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). This case deals with just such a question. Shabazz brought the root action in an individual capacity, and not as the representative of a class of inmates. When he was removed from the Jail, then, any question of the library policy's constitutionality ceased to affect Shabazz's rights, which were the only rights at issue in the action. The issue of the injunction thus ordinarily would be moot.

■ Shabazz argues, however, that the circumstances of his case are "capable of repetition yet evading review," and therefore merit exception from the usual mootness rule. The exception applies when: 1) duration of the challenged conduct is too brief ever to be fully litigated prior to its cessation; and 2) a reasonable expectation is shown that plaintiff will again be subject to the challenged activity. *GTE California v. FCC,* 39 F.3d 940, 945 (9th Cir.1994).

When it issued its Orders, the court noted that the duration of an inmate's stay in the Jail is short, typically only 38 days. Any challenge an inmate might make to the Jail's library access policy would move too slowly through the legal system to reach conclusion in that period. From these facts the court concluded that Shabazz had satisfied the "evading review" prong of the exception's test. Dupnik does not dispute this conclusion.

The court also recognized that although Shabazz had been moved to the state prison before it issued either of its last two injunctions, Shabazz was pursuing post-conviction relief, which if granted would necessitate his return to the Jail during pendency of such proceedings and a possible new trial. After considering this information, the court found that there was in fact a reasonable expectation that Shabazz would "again be subject to the challenged library access policy." The court held that the "capable of repetition"

prong of the test was also satisfied, and concluded that the issue was not moot.

■ At the time the district court ordered the injunctions, Shabazz's circumstances arguably satisfied the exception's second prong. Those circumstances have changed. The Arizona Court of Appeals has since denied Shabazz's petitions for post-conviction relief. Shabazz's only reason for returning to the Jail no longer exists, and it is clear that he now has no expectation that he will be again subject to the Jail's policies. Because we determine questions of mootness in light of the present circumstances where injunctions are involved, *Weinstein v. Bradford,* 423 U.S. 147, 148, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), we conclude that the issue is moot and vacate each of the district court's injunctive orders.

## CONCLUSION

We reverse the district court's summary judgment against appellant Robare on the issue of liability for violating Shabazz's civil rights, and remand for further proceedings. We reverse the judgment against appellant Garland.

We affirm summary judgment against appellants Dupnik, Bosman and Fimbres on the issue of liability for violation of Shabazz's constitutional rights, but reverse the court's order and judgment for punitive damages against those defendants. We affirm the judgment for compensatory damages. Finally, we vacate as moot the district court's orders enjoining the Sheriff to adopt and publish a library access policy and establishing an access policy.

AFFIRMED in part; REVERSED in part; VACATED in part and REMANDED. The parties will bear their own costs on appeal.