**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA ROBERT BROWN, *Plaintiff-Appellant*, <br><br> v. <br><br> OREGON DEPARTMENT OF CORRECTIONS; MAX WILLIAMS; STAN CZERNIAK; MICHAEL GOWER; BARBARA COONEY; JOAN BARTON; GREG JONES; MARK NOOTH; JUDY GILMORE; JACK BLANKENBAKER; HEIDI MACKENZIE; THERESA HICKS, in their individual and official capacities, *Defendants-Appellees*. | No. 11-35628 <br><br> D.C. No. 3:10-cv-00003-BR <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
March 4, 2014—Portland, Oregon

Filed April 29, 2014

Before: Alfred T. Goodwin, Stephen S. Trott,
and William A. Fletcher, Circuit Judges.

Opinion by Judge Goodwin

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed the district court's summary judgment in favor of prison officials in a 42 U.S.C. § 1983 action in which a prisoner alleged that officials violated his due process rights by housing him in the Intensive Management Unit without periodic, meaningful review of his status.

The panel held that plaintiff's twenty-seven month confinement in the Intensive Management Unit, without a meaningful review, imposed an atypical and significant hardship that implicated a protected liberty interest which gave rise to the procedural protections of the Due Process Clause. The panel also held, however, that plaintiff's claims against the Oregon Department of Corrections and his damages claims against the individual defendants in their official capacities were barred by the Eleventh Amendment. Plaintiff's remaining damages claims were barred by qualified immunity because, although a lengthy confinement without meaningful review may constitute atypical and significant hardship, the panel could not hold defendants liable for the violation of a right that was not clearly established at the time the violation occurred.

The panel affirmed the district court's summary judgment on plaintiff's claim for declaratory relief because the record showed that he had been released from the Intensive

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Management Unit and there was no evidence that he was likely to again be subject to the challenged conditions.

**COUNSEL**

Tobias W. Mock (argued), Keith Slenkovich, Wilmer Hale LLP, Palo Alto, California, for Plaintiff-Appellant.

Tiffany Keast (argued), Assistant Attorney General, Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Oregon Department of Justice, Salem, Oregon, for Defendants-Appellees.

**OPINION**

GOODWIN, Circuit Judge:

Joshua Robert Brown, currently incarcerated at Oregon's Snake River Correctional Institution ("SRCI"), appeals the district court's summary judgment in his pro se 42 U.S.C. § 1983 action. Brown alleges that prison officials violated his due process rights by housing him in the Intensive Management Unit ("IMU") without periodic, meaningful review of his status.

We hold that, under any plausible baseline, Brown's conditions of confinement implicate a protected liberty interest giving rise to the procedural protections of the Due Process Clause. We also hold, however, that defendants are entitled to Eleventh Amendment and qualified immunity. We therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Brown was assigned a Level 5 custody classification and placed in the IMU at SRCI on June 18, 2008, after being found in possession of a weapon. He remained confined in the IMU at either SRCI or the Oregon State Penitentiary ("OSP") for twenty-seven consecutive months, until his release to the OSP general population on September 22, 2010.

Pursuant to the Oregon Administrative Rules, a Level 5 custody classification is the highest level of supervision and is assigned to inmates demonstrating "behaviors that in the judgment of the department present a threat sufficient to require special security housing on intensive management status." Oregon Administrative Rule ("OAR") 291-104-0111(9)(a)(A). Level 5 classifications are assigned by the Special Population Management Committee. OAR 291-104-0125(3)(a). Once an inmate is assigned to Level 5, he is placed in the IMU or an IMU-status cell, and that status remains until the inmate "is manually scored to a lower custody classification level by the assigned institutional counselor." OAR 291-104-0125(3)(b); *see also* OAR 291-055-0005(3)(b), 0031.

IMU inmates are held in solitary confinement for more than twenty-three hours per day. They are permitted outside of their cells for a total of only forty minutes per day and may spend thirty of those minutes engaged in recreation. Half of that time–fifteen minutes–may be spent in an "outside" facility reserved for IMU use, within a fifteen by forty-foot room with high, concrete walls covered by a metal grate. Inmates in the general population, in contrast, receive twenty-five to thirty hours per week for recreation and social interaction, including two to five hours of outside recreation

every day. IMU inmates are permitted two non-contact visits per month and a maximum of two visitors in a six-month period, while general-population inmates are permitted between eleven and twenty-two contact visits per month and an unlimited number of approved visitors. IMU inmates are denied access to many other privileges afforded inmates in the general population, including access to the prison and law libraries, group religious worship, educational and vocational opportunities, telephone use except in emergencies, access to televisions, and access to personal property.

IMU inmates are assigned a numerical "Programming Level" between 1 and 4. OAR 291-055-0020. Upon their placement in the IMU, inmates are assigned to Programming Level 2 and are given mandatory behavior-modification programs comprising individual program "packets." OAR 291-055-0020(2)(b), (d). Inmates are not eligible for release from the IMU until they have attained Programming Level 4 status, which requires "successful completion" of the assigned packets. OAR 291-055-0020(2)(d)(C). Because only one program packet may be completed in any two-week period, the duration of an inmate's confinement is dependent on the number of packets that he is assigned.

Although prior Oregon Department of Corrections ("ODOC") regulations required reviews of inmates' custody classifications every six months, *see* OAR 291-104-0125 (abrogated), ODOC discontinued this practice following amendments to the administrative rules in May 2008. Current review procedures consist only of "programming" reviews, thirty-day reviews of each IMU inmate's programming status. OAR 291-055-0020(2), 0025(2). As part of this review procedure, within thirty days of an inmate reaching Programming Level 4, the Inmate Program Committee is

required to provide a written recommendation for or against release from the IMU to the Classification Transfer Unit, which is charged with making the final determination regarding the inmate's classification status. OAR 291-055-0031(2)–(3).

The Administrative Segregation Unit ("ASU") and Disciplinary Segregation Unit ("DSU") constitute other forms of segregated housing in the ODOC prison system. ASU is "[a]dministrative housing for those inmates whose notoriety, actions, or threats jeopardize the safety, security, and orderly operation of the facility." OAR 291-046-0010(3). DSU is punitive housing reserved for inmates "in violation of rules of prohibited conduct." OAR 291-011-0005(2).

Unlike the IMU, inmates may not be housed in the DSU for longer than 180 days, and are entitled to thirty-day "assessment" reviews evaluating whether to recommend their early release from segregation. OAR 291-105-0066(10), 291-011-0030(3). Other conditions of confinement in the DSU generally are similar to conditions in the IMU, although DSU inmates are not required to participate in behavior-modification programs.

Retention in the ASU is limited to no more than thirty days without a hearing and status review and no more than 180 days without "due process." OAR 291-046-0025(4), 0085(2), 0090(1). Conditions in the ASU are less restrictive than in the IMU, with ASU inmates afforded access to telephones, televisions, computers, and personal shoes and other property. Inmates in the ASU are permitted seven hours of recreation per week and are not required to participate in behavior-modification programs.

Brown was assigned to the IMU at SRCI on June 18, 2009 and given fifty-three behavior-modification packets. The subject matter of at least thirty of Brown's assigned packets had no relationship to his underlying crime, the basis for his confinement in the IMU, or the IMU's stated security objectives.

The Inmate Program Committee conducted four programming reviews of Brown's status between July and September 2008, advancing him from Programming Level 2 to 3 on October 21, 2008. The record does not include evidence of any additional programming reviews until June 2009. Thereafter, the Inmate Program Committee reviewed Brown's programming status every month, keeping him at Programming Level 3 pending the "successful completion" of his assigned mandatory programming packets. The Inmate Program Committee's meeting minutes state only that Brown "is programming–no change." Brown completed his behavior-modification programming and was promoted to Programming Level 4 on August 24, 2010. He was released from the IMU on September 22, 2010.

While housed in the IMU, Brown submitted eight petitions to prison officials requesting review of his classification status. Those requests were denied, and Brown was not afforded a review of his classification status until the eve of his eventual release from the IMU.

Brown filed a pro se 42 U.S.C. § 1983 action alleging, among other things, that defendants had violated his due process rights under the Fourteenth Amendment by failing to provide periodic, meaningful reviews of his confinement. Defendants moved for summary judgment; Brown did not cross-move. The district court granted summary judgment on

Brown's due process claim because it concluded that ODOC officials had conducted programming reviews of Brown's classification once per month in accordance with policy, and Brown had no liberty interest in freedom from segregation in the IMU.

Now represented by pro bono counsel, Brown assigns error only to the summary judgment on his due process claim.

## DISCUSSION

On de novo review, *Morrison v. Hall*, 261 F.3d 896, 900 (9th Cir. 2001), we hold that, under any plausible baseline, Brown's conditions of confinement implicate a protected liberty interest giving rise to procedural due process protections. We also hold, however, that defendants are entitled to immunity.

### A.  Due Process

Prisoners are entitled to certain due process protections when subject to disciplinary sanctions. *See Wolff v. McDonnell*, 418 U.S. 539, 564–71 (1974). In *Sandin v. Conner*, however, the Supreme Court held that these procedural protections adhere only where the deprivation implicates a protected liberty interest–that is, where the conditions of confinement impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995). We may consider "1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether

the state's action will invariably affect the duration of the prisoner's sentence." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (citations omitted). If a protected liberty interest is at stake, then the court must determine whether the procedures used to deprive the prisoner of that liberty violate due process. *See id.* at 860.

The district court granted summary judgment on Brown's due process claim because it concluded, first, that defendants had conducted periodic reviews of the classification status that kept Brown confined in the IMU, and second, that the challenged conditions in the IMU were not atypical in comparison to conditions in the ASU and DSU. We hold that defendants are not entitled to summary judgment on either ground.

First, the record shows–and defendants' counsel conceded at oral argument–that Brown received no meaningful review of his IMU confinement for twenty-seven months. Brown's term of confinement in the IMU was dependent on his completion of fifty-three assigned packets. Because an inmate may complete only one program packet in any two-week period, Brown's confinement in the IMU could not possibly have lasted less than 106 weeks, regardless of the appropriateness of his continued segregation. Given that prison officials lack discretion to promote an inmate from one programming level to another or to release an inmate from the IMU before he completes the assigned packets, Brown's programming reviews were essentially meaningless.

Second, under any plausible baseline, Brown's twenty-seven month confinement in the IMU without meaningful review "impose[d] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin*,

515 U.S. at 484.  As an initial matter, we recognize that the baseline for determining "atypical and significant hardship" is not entirely clear.  We have noted that "[t]he *Sandin* Court seems to suggest that a major difference between the conditions for the general prison population and the segregated population triggers a right to a hearing," *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), but have not clearly held that conditions in the general population, as opposed to those in other forms of administrative segregation or protective custody, form the appropriate baseline comparator.  *Cf. Ramirez*, 334 F.3d at 861 (identifying as a guidepost for evaluating atypical and significant hardship "whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority" (quoting *Sandin*, 515 U.S. at 486)).  The Supreme Court acknowledged this uncertainty in *Wilkinson v. Austin*, noting that "[i]n *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." 545 U.S. 209, 223 (2005).  It chose not to resolve the issue, however, concluding, "[W]e are satisfied that [the challenged conditions] impose[] an atypical and significant hardship under any plausible baseline."  *Id.*

Similarly, we need not locate the appropriate baseline here because Brown's twenty-seven month confinement in the IMU imposed an atypical and significant hardship under any plausible baseline.  Confinement in the IMU subjected Brown to solitary confinement for over twenty-three hours each day with almost no interpersonal contact, and denied him most privileges afforded inmates in the general population.  While these conditions alone might apply to most

solitary-confinement facilities, here there is a crucial factor distinguishing confinement in the IMU: the duration of Brown's confinement. *See Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."). Brown was given a fixed and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the limited period of confinement with periodic review afforded inmates in ODOC's other segregated-housing units. Retention in the ASU is limited to no more than thirty days without a hearing or status review. Retention in the DSU–where conditions of confinement generally are similar to conditions in the IMU–is limited by thirty-day assessment reviews, with the maximum period of confinement limited to six months. Brown's conditions of confinement in the IMU thus implicate a protected liberty interest under any plausible baseline.

## B. Immunity

We nonetheless affirm the district court's grant of summary judgment because defendants are entitled to Eleventh Amendment and qualified immunity. *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (explaining that we may affirm on any ground supported by the record). First, Brown's claims against the Oregon Department of Corrections and his damages claims against the individual defendants in their official capacities are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear . . . that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982)

(explaining that "Eleventh Amendment immunity extends to actions against state officers sued in their official capacities because such actions are, in essence, actions against the governmental entity," but "does not bar actions against state officers in their official capacities if the plaintiffs seek only a declaratory judgment or injunctive relief").

Second, Brown's remaining damages claims are barred by qualified immunity. Government officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a two-part analysis for resolving qualified immunity claims, which we may address in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, we must consider whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 236. Second, we must determine whether the right was clearly established at the time of the alleged violation. *Saucier*, 522 U.S. at 201. Even if the right was clearly established at the time of the violation, it may be "difficult for [the defendant] to determine how the relevant legal doctrine . . . will apply to the factual situation the [defendant] confronts." *Id.* at 205. Therefore, "[i]f the . . . mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." *Id.*

We begin with the second prong of the qualified-immunity analysis: whether the right was clearly established

at the time of the alleged violation. Until now, this court has not addressed whether the absence of post-placement periodic, meaningful review of confinement in a disciplinary-segregation unit may give rise to a protected liberty interest. We previously have found a state-created liberty interest in review of prisoners' confinement arising from language of state prison regulations. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1097–98 (9th Cir. 1986), *abrogated in part on other grounds by Sandin*, 515 U.S. 472. However, the Supreme Court has since "refocused the test for determining the existence of a liberty interest away from the wording of prison regulations and toward an examination of the hardship caused by the prison's challenged action relative to 'the basic conditions' of life as a prisoner." *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996) (quoting *Sandin*, 515 U.S. at 485). Thus, we must now evaluate whether the deprivation in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Although we conclude that a lengthy confinement without meaningful review may constitute atypical and significant hardship, our case law has not previously so held, and we cannot hold defendants liable for the violation of a right that was not clearly established at the time the violation occurred.

Qualified immunity "is only an immunity from a suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief." *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012). We affirm the district court's summary judgment on Brown's claim for declaratory relief, however, because the record shows that Brown has been released from the IMU and there is no evidence that he is likely to again be subject to the challenged conditions. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)

(holding that past exposure to harm does not confer standing to obtain equitable relief "[a]bsent a sufficient likelihood that [the plaintiff] will again be wronged in a similar way"). Accordingly, we affirm the district court's summary judgment.

**AFFIRMED.**