**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TODD LEWIS ASHKER; DANNY TROXELL; GEORGE RUIZ; JEFFREY ANTHONY FRANKLIN; GEORGE FRANCO; GABRIEL RALPH REYES; RICHARD K. JOHNSON; PAUL A. REDD, Jr.; LUIS ESQUIVEL; RONNIE N. DEWBERRY, | Nos. 21-15839 22-15345 |
| | D.C. No. 4:09-cv-05796-CW |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| GAVIN NEWSOM, Governor of the State of California; MATTHEW CATE; ANTHONY CHAUS, Chief, Office of Correctional Safety, CDCR; GREG LEWIS, Warden, | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted May 18, 2023
SD Carter & Keep U.S. Courthouse

Filed August 24, 2023

Before:  J. Clifford Wallace and Ryan D. Nelson, Circuit Judges, and James S. Gwin,[*] District Judge.

Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson

## SUMMARY[**]

### Prisoner Civil Rights

The panel (1) reversed the district court's order granting inmates a twelve-month extension of a 2015 settlement agreement in which the State of California agreed to stop housing inmates in solitary confinement for long-term or indefinite periods based on gang affiliation; and (2) vacated on jurisdictional grounds the district court's order granting inmates a second twelve-month extension of the settlement agreement, and dismissed the appeal from that order as moot.

Pursuant to the 2015 settlement agreement, the California Department of Corrections and Rehabilitation and state officials (collectively "CDCR") agreed to implement various reforms.  The inmates' counsel would monitor compliance for twenty-four months and could seek a twelve-

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

month extension if the inmates demonstrated a continuing constitutional violation that was either alleged in their complaint or resulted from the settlement agreement's reforms.

The panel reversed the district court's order granting the first twelve-month extension of the settlement agreement. First, the panel held that there was no basis for extending the agreement based on the inmates' claim that the CDCR regularly mischaracterizes the confidential information used in disciplinary hearings and fails to verify the reliability of that information. The claim was not alleged in the inmates' complaint, CDCR's alleged misuse of confidential information was not caused by the agreement's reforms, and plaintiffs failed to demonstrate current and ongoing systemic Fourteenth Amendment due process violations arising from CDCR's confidential information disclosures and reliability determinations.

Next, the panel held that there was no basis for extending the agreement based on the inmates' claim that CDCR unconstitutionally validates inmates as gang affiliates and fails to tell the parole board that old gang validations are flawed or unreliable. The claim was not included in, or sufficiently related to, the complaint. Moreover, even if the prior validation process and resulting validations were deficient, an extension was not justified because CDCR had no reason to doubt the reliability of the validations and did not misrepresent or omit information to the parole board deliberately or with reckless disregard for the truth.

Finally, the panel held that there was no basis for extending the agreement based on the inmates' claim that CDCR violates due process by placing inmates with safety concerns in the Restrictive Custody General Population Unit

("RCGP"). The inmates do not have a liberty interest in avoiding RCGP placement, which does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life. Moreover, CDCR employed constitutionally sufficient procedural protections in effecting the placements.

Because the first twelve-month extension of the settlement agreement was improper, the district court's jurisdiction over the matter terminated when the agreement's initial twenty-four-month monitoring period ended. The district court therefore lacked jurisdiction to order the second twelve-month extension of the settlement agreement. The panel vacated the district court's second extension order and dismissed the appeal from that order as moot.

Concurring, Judge R. Nelson, joined by Judge Gwin, noted that this court has not definitively resolved what the proper baseline is for measuring what constitutes an atypical and significant hardship in evaluating whether inmates have a liberty interest in avoiding certain conditions of confinement. In his view, the conditions of administrative segregation or protective custody are the proper baseline comparators when determining whether a challenged prison condition is atypical and significant.

---

## COUNSEL

Sarah M. Brattin (argued), Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; California Attorney General's Office, Sacramento, California; Jeffrey T. Fisher, and Neah Huynh, Supervising Deputy Attorneys

General; Cassandra J. Shryock (argued), Deputy Attorney General; California Attorney General's Office, San Francisco, California; for Defendants-Appellants.

Jules Lobel (argued), Pittsburgh, Pennsylvania; Carmen E. Bremer (argued), Bremer Law Group PLLC, Seattle, Washington; Rachel A. Meeropol, American Civil Liberties Union, Criminal Law Reform Project, New York, New York; Samuel Miller, Center for Constitutional Rights, New York, New York; Charles F.A. Carbone, Law Offices of Charles Carbone, San Francisco, California; Matthew D. Strugar, Law Office of Matthew Strugar, Los Angeles, California; Anne M. Cappella, Weil Gotshal & Manges LLP, Redwood Shores, California; Anne Butterfield Weills, Siegel Yee & Brunner, Oakland, California; Caitlin Sandley, Center for Constitutional Rights, Birmingham, Alabama; Baher Azmy, Center for Constitutional Rights, New York, New York; for Plaintiffs-Appellees.

Donald Specter, Margot Mendelson, and Patrick Booth, Prison Law Office, Berkeley, California, for Amici Curiae Former Corrections Officials.

Paula Mitchell, The Project for the Innocent at Loyola Law School, Loyola Law School, Los Angeles, California; Linda Starr, The Northern California Innocence Project, Santa Clara University School of Law, Santa Clara, California; Anton Robinson and Faith Barksdale, The Innocence Project Inc., New York, New York; Alexander Simpson, The California Innocence Project, California Western School of Law, San Diego, California; for Amici Curiae The California Innocence Project, The Innocence Project, The Northern California Innocence Project, and The Project for the Innocent at Loyola Law School.

**OPINION**

R. NELSON, Circuit Judge:

A settlement agreement generally ends a legal dispute. Here, it was just the beginning. In August 2015, the State of California settled a dispute with a plaintiff class of inmates over alleged constitutional violations. Eight years later, the dispute continues.

In settlement, the State agreed to stop housing inmates in solitary confinement for long-term or indefinite periods based on gang affiliation. The inmates' counsel would monitor the state's compliance for two years. The settlement agreement and monitoring period could be extended for twelve months if the inmates demonstrated continuing constitutional violations that were either alleged in their complaint or resulted from the agreement's reforms.

The inmates twice successfully extended the settlement agreement before the district court. We are tasked with determining whether the settlement agreement was properly extended based on the alleged constitutional violations. For the reasons below, we reverse in part, vacate in part, and dismiss in part the district court's extensions of the settlement agreement.

I

Nearly fourteen years ago, California inmates Todd Ashker and Danny Troxell filed a pro se action challenging their conditions of confinement in the Pelican Bay solitary housing facility. They ultimately secured counsel and converted their action into a putative class action with other long-term inmates incarcerated in Security Housing Units ("SHU") and living in similar conditions. The plaintiff class

of California inmates ("Inmates") sued the California Department of Corrections and Rehabilitation, the Governor of California, and other state correctional officials (collectively, "CDCR"). The Inmates alleged violations of the Eighth Amendment and the Fourteenth Amendment Due Process Clause based on CDCR's practice of housing inmates in SHU based solely on "gang validation"—the prison's determination that an inmate is affiliated with a prison gang.

The parties ultimately settled the action in a written settlement agreement ("Settlement Agreement"). Under the Settlement Agreement, CDCR agreed to implement various reforms within Pelican Bay and other CDCR SHU facilities. Those reforms were chiefly intended to end the practice of SHU placement based on gang validation alone, eliminate indeterminate SHU sentences, reevaluate the placement of inmates currently serving indeterminate SHU sentences based on gang validation, and implement related reforms.

## A

Several of the Settlement Agreement's reforms are relevant to this appeal. For instance, rather than place inmates in SHU based on gang validation status alone, an inmate can now be housed there only if found guilty of a SHU-eligible offense in a disciplinary hearing. The Settlement Agreement also states that CDCR must continue adhering to existing state regulations about the use of confidential information in disciplinary proceedings and train staff who use that information. And CDCR was required to produce documents relating to determinations about whether class members were guilty of SHU-eligible offenses, including confidential information.

The Settlement Agreement also created the Restrictive Custody General Population Unit ("RCGP"), designed to house inmates released from SHU under the Settlement Agreement who face threats to their safety. The RCGP is designed to increase social interaction, including educational opportunities, out-of-cell time in small group yards, religious services, job assignments, leisure time activity groups, and contact visits from family members—all without the use of mechanical restraints.

CDCR must also regularly review inmates' RCGP placement. The Institution Classification Committee ("ICC") reviews the placement of inmates every 180 days. If the ICC determines that an inmate no longer faces a threat to his safety, it refers the inmate to the Departmental Review Board ("DRB") for review. In the DRB hearing, an inmate is aided by a staff assistant in presenting his case.

The parties also agreed that the Inmates' counsel (under the district court's supervision) would monitor CDCR's compliance with the Settlement Agreement for twenty-four months. During that time, CDCR had to produce certain documents, and the Inmates' counsel collected attorney's fees from CDCR for monitoring and enforcing CDCR's compliance. The Inmates can extend the Settlement Agreement for twelve months if they establish by a preponderance of the evidence a "current and ongoing systemic" constitutional violation "as alleged in" either the Inmates' Second Amended Complaint or Supplemental Complaint (collectively, the "Complaint") or "as a result of CDCR's reforms to its Step Down Program or the SHU

policies contemplated by this Agreement."[1]  The Settlement Agreement provides that if the Inmates fail to make this showing, the "Agreement and the Court's jurisdiction over this matter shall automatically terminate, and the case shall be dismissed."

B

The district court approved the Settlement Agreement, and the twenty-four-month monitoring period commenced. Once the monitoring period concluded, the Inmates invoked the extension provision based on three alleged violations of the Fourteenth Amendment Due Process Clause.  The magistrate judge recommended granting the Inmates' extension motion, relying on two of the alleged violations.[2] Considering the magistrate judge's recommendation, the district court granted the motion but relied on all three of the Inmates' alleged due process violations.  The district court also permitted the Inmates to move for a second extension of the Settlement Agreement.  CDCR appealed.

After the first twelve-month extension, the Inmates sought a second extension of the monitoring period based on nearly identical allegations of due process violations.  This

---

[1] The "Step Down Program" is an incentive-based, multi-step process designed to afford validated inmates a way to transfer into the general population.

[2] The magistrate judge initially granted the motion outright.  We held that the magistrate judge's order was not final and dismissed the appeal, allowing the district court on remand to "constru[e] the magistrate judge's extension order 'as a report and recommendation and afford the parties reasonable time to file objections.'"  *Ashker v. Newsom*, 968 F.3d 975, 985 (9th Cir. 2020) (*Ashker I*) (quoting *Allen v. Meyer*, 755 F.3d 866, 869 (9th Cir. 2014)).  This appeal follows the district court's order on remand.

time, the magistrate judge recommended denying the motion.  But the district court disagreed and granted the second extension as well.  CDCR again appealed.

The two appeals challenging the district court's extension orders were consolidated for argument.  We address each appeal below.

## II

We have subject-matter jurisdiction over district courts' final orders under 28 U.S.C. § 1291.  We review the district court's enforcement of a settlement agreement for abuse of discretion, *Parsons v. Ryan*, 949 F.3d 443, 453 (9th Cir. 2020), but we review the interpretation of a settlement agreement de novo, *Ashker v. Newsom*, 968 F.3d 939, 944 (9th Cir. 2020) (*Ashker II*).  "We defer to any factual findings made by the district court in interpreting the settlement agreement unless they are clearly erroneous." *Parsons*, 949 F.3d at 453 (quoting *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010)) (alteration adopted).

## III

We first address CDCR's appeal of the district court's first extension order.  Under paragraph 41 of the Settlement Agreement, the Inmates must satisfy two requirements for an extension.  They must demonstrate by a preponderance of the evidence (1) a current and ongoing systemic constitutional violation (2) either alleged in the Complaint or resulting from the Settlement Agreement's reforms to its Step Down Program or SHU policies.[3]

---

[3] Paragraph 41 of the Settlement Agreement reads:

> Plaintiffs shall have thirty days after the end of the twenty-four-month period to seek an extension, not to

The Inmates raise three claims, each independently sufficient to extend the Settlement Agreement if successful. The "Confidential Information Claim" alleges that CDCR regularly mischaracterized the confidential information used in disciplinary hearings, and failed to verify the reliability of that information. The "Parole Claim" alleges that CDCR unconstitutionally validated inmates as gang affiliates and failed to tell the parole board that old gang validations were constitutionally suspect. The "RCGP Claim" alleges that CDCR's notice and periodic reviews provided inadequate due process for inmates placed in the RCGP. We must first determine whether each claim is alleged in the Complaint or results from the Settlement Agreement's SHU or Step Down Program reforms. Next, because all three claims allege violations of the Fourteenth Amendment Due Process

exceed twelve months, of this Agreement and the Court's jurisdiction over this matter by presenting evidence that demonstrates by a preponderance of the evidence that current and ongoing systemic violations of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment of the United States Constitution exist as alleged in Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to its Step Down Program or the SHU policies contemplated by this Agreement. Defendants shall have an opportunity to respond to any such evidence presented to the Court and to present their own evidence. If Plaintiffs do not file a motion to extend court jurisdiction within the period noted above, or if the evidence presented fails to satisfy their burden of proof, this Agreement and the Court's jurisdiction over this matter shall automatically terminate, and the case shall be dismissed.

Clause, we must determine whether each claim alleges an ongoing and systemic due process violation.

## A

We begin with the Inmates' Confidential Information Claim. When prison officials learn information about an inmate from a confidential source, under CDCR regulations, that information is documented in a confidential memorandum not disclosed to the inmate. Cal. Code Regs. tit. 15 § 3321; *Ashker v. Newsom*, No. 09-cv-05796 CW, 2021 WL 5316414, *16 (N.D. Cal. Apr. 9, 2021) (*Ashker III*). If that confidential information is subsequently used in a disciplinary proceeding, prison officials provide the inmate with a confidential disclosure form, which summarizes the information without revealing anything sensitive or confidential, such as the informant's identity. Cal. Code Regs. tit. 15 § 3321; *Ashker III*, 2021 WL 5316414, at *16.

The Inmates argue that CDCR violates inmates' due process rights by misrepresenting the evidence in confidential disclosure forms as more inculpatory and by failing to verify the confidential information's reliability. The district court ruled that the Confidential Information Claim resulted from the Settlement Agreement's SHU or Step Down Program reforms, and is thus a proper basis for extension. *Ashker III*, 2021 WL 5316414, at *14. The district court then determined that CDCR systemically denies inmates due process. *Id.* at *19–20. We disagree with the district court on both counts.

## 1

We interpret the Settlement Agreement de novo to determine whether it authorizes extension based on the Confidential Information Claim. *See Ashker II*, 968 F.3d at

944. In doing so we apply state law—here, the law of California as provided in the Settlement Agreement. *See Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1089 (9th Cir. 2015).

In California, contract law applies to settlement agreements. *Ashker II*, 968 F.3d at 944. "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *California v. Continental Ins.,* 281 P.3d 1000, 1004 (Cal. 2012) (citations omitted). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* (citations omitted). "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Id.* (cleaned up).

The Inmates contend that the Confidential Information Claim falls within the extension provision both because it is alleged in the Complaint and because it results from CDCR's reforms to its Step Down Program or SHU policies. We disagree.

First, the Inmates' Complaint does not allege the same due process violation as the Confidential Information Claim. The Inmates mainly rely on paragraph 202 of the second amended complaint, which alleges that CDCR is

> violating plaintiffs' due process rights by retaining plaintiffs and the class in conditions that amount to an atypical and significant hardship without legitimate penological interest, as this detention occurs without reliable evidence that plaintiffs and the class

> are committing any acts on behalf of a prison
> gang and are thus active gang members.

The Complaint also addresses how confidential information is used for validating gang membership and alleges that CDCR unlawfully places inmates in SHU based on gang validation status alone, that is, without proof that an inmate committed any overt SHU-eligible act.

By contrast, the Confidential Information Claim alleges that CDCR violates due process by inadequately disclosing confidential information and failing to verify its reliability in inmate disciplinary hearings. This claim is necessarily distinct because the Complaint contends that CDCR failed to conduct disciplinary hearings at all, instead relying on gang validation status to place inmates in SHU. The Complaint does not allege that confidential information is being misrepresented to inmates.

Second, the Confidential Information Claim is not "a result of" the Settlement Agreement's SHU or Step Down Program reforms. The district court concluded otherwise by emphasizing paragraph 34 of the Settlement Agreement, *Ashker III*, 2021 WL 5316414, at *13–14, which requires CDCR to "adhere to the standards for the consideration of and reliance on confidential information set forth in" the California Code of Regulations and "implement appropriate training for impacted staff members" to "ensure that the confidential information used against inmates is accurate." The district court also highlighted paragraph 37, which requires CDCR to produce a sample of documents, including confidential information, that CDCR relied on to find inmates guilty of SHU offenses. *Id.* The Inmates add that their Confidential Information Claim also results from the Settlement Agreement's reform that inmates must now go

through the disciplinary process to be placed in SHU rather than being placed based on gang validation alone.

Applying California contract law to interpret the Settlement Agreement, *Ashker II*, 968 F.3d at 944, we give the terms their "clear and explicit meaning . . . interpreted in their ordinary and popular sense," *Continental Ins.,* 281 P.3d at 1004 (internal quotation marks and citation omitted). In a statutory context, the Supreme Court of California held that "[t]he phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance." *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 887 (Cal. 2011) (citations omitted); *accord Ass'n de Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 (9th Cir. 2013); *see also Paroline v. United States*, 572 U.S. 434, 445 (2014) ("The words 'as a result of' plainly suggest causation."). We conclude that the phrase "as a result of" in the Settlement Agreement has the same ordinary and popular meaning.

Under the Settlement Agreement's extension provision, the Inmates bear the burden to show by a preponderance of the evidence that their alleged due process violation is a proper basis for extension. They must produce evidence showing that it is more likely than not, *Conservatorship of O.B.*, 470 P.3d 41, 44 (Cal. 2020), that CDCR's alleged confidential information misuse was caused by the Settlement Agreement's SHU or Step Down Program reforms, *see Kwikset Corp.*, 246 P.3d at 887.

As discussed, paragraphs 34 and 37 of the Settlement Agreement require CDCR to continue adhering to state regulations concerning confidential information use, implement training, and produce documents containing confidential information that CDCR relied on in disciplinary

hearings.  CDCR correctly points out that adhering to state regulations is not a "reform" because CDCR has always been subject to these regulations.  *See Reform*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reform (last visited July 27, 2023) (listing definitions that require some form of change from previous practice).  Implementing training and producing documents are new practices required by the Settlement Agreement (and therefore reforms), but they are not reforms to CDCR's "Step Down Program or the SHU policies contemplated by" the Settlement Agreement because they effected no change—and so no reform—to the Step Down Program or SHU policies.

That is not to say the Inmates had no recourse if CDCR failed to meet these obligations.  Under the "Compliance" heading of the Settlement Agreement, paragraph 53 authorized the Inmates to seek enforcement in the district court if CDCR did not substantially comply with the terms of the Settlement Agreement.  Paragraph 53 encompasses noncompliance insufficient to justify extending the Settlement Agreement.  This includes CDCR's obligations to abide by state regulations, implement training, and produce documents.  Indeed, the Inmates moved for several enforcement orders during the initial twenty-four-month monitoring period.

Our conclusion does not make the provisions requiring CDCR to produce confidential documents meaningless, as the district court suggested.  *See Ashker III*, 2021 WL 5316414, at *14 (concluding that CDCR's interpretation "gives no effect to [the document production] provisions").  For one thing, our task is to determine whether the alleged constitutional violation was caused by the Settlement Agreement's SHU or Step Down Program reforms—not to

speculate about why the parties included certain provisions. Regardless, the document production obligations are not meaningless simply because they do not support extending the Settlement Agreement on this basis. The Settlement Agreement includes several provisions and obligations that are not "reforms to [CDCR's] Step Down Program or the SHU policies contemplated by" the Settlement Agreement. And the Inmates could have enforced CDCR's compliance with those obligations under paragraph 53 during the twenty-four-month period. But the parties agreed to a narrower set of grounds for extending the Settlement Agreement. It is no surprise that the grounds for extending the Settlement Agreement are narrower because extension is stronger medicine than enforcement during the initial monitoring period.

Even if the obligations in paragraphs 34 and 37 could be grounds for an extension, the Inmates' alleged constitutional violation in the Confidential Information Claim was not "as a result of" or "caused by" these reforms. *See Kwikset Corp.*, 246 P.3d at 887. The same is true for the shift in SHU placement criteria from gang validation to disciplinary hearings—undisputedly a reform to CDCR's Step Down Program or SHU policies. The Confidential Information Claim is that CDCR misrepresents confidential information in disciplinary proceedings and fails to verify that information's reliability. But the Inmates have not proven by a preponderance of the evidence that adhering to state regulations, implementing training, producing documents, or changing SHU placement criteria from gang validation to disciplinary hearings *caused* CDCR's alleged misuse of confidential information. *See id.* Nothing in the record suggests that CDCR changed the way it handles confidential information because of the Settlement Agreement.

The Inmates' position that the Confidential Information Claim results from the Settlement Agreement's reforms stems from an overly broad reading of the extension provision and would stretch that provision to encompass more constitutional violations than its text reaches. We must interpret the Settlement Agreement according to its terms. *See Continental Ins.,* 281 P.3d at 1004 (the parties' intent "is to be inferred, if possible, solely from the written provisions of the contract" (citations omitted)). The Settlement Agreement carefully limits extension to constitutional violations that are alleged in the Complaint or "as a result of" the Settlement Agreement's SHU or Step Down Program reforms. And the plain meaning of "as a result of" is "caused by." *Kwikset Corp.*, 246 P.3d at 887. Because CDCR's alleged misuse of confidential information was not caused by the Settlement Agreement's reforms, the Confidential Information Claim is an improper basis for extending the Settlement Agreement.

2

Regardless, the Confidential Information Claim still would not justify extending the Settlement Agreement because it does not demonstrate a current and ongoing systemic due process violation. The Inmates' Confidential Information Claim alleges two categories of misconduct. The district court held that, regarding both insufficient confidential information disclosures and the lack of reliability determinations, the Inmates had presented evidence of an ongoing and systemic due process violation. *Ashker III*, 2021 WL 5316414, at *15–20.

Inmates' due process rights in disciplinary hearings are governed by *Wolff v. McDonnell*, 418 U.S. 539 (1974).[4] Among other requirements, *Wolff* requires that an inmate facing a disciplinary hearing be provided written notice of the charges and the ability to call witnesses and present documentary evidence in his defense. *Id.* at 564–66. We have explained that *Wolff*'s requirement that an inmate be allowed to present evidence in his defense means that the inmate "must also have the right to access evidence that he might use in preparing or presenting his defense." *Melnik v. Dzurenda*, 14 F.4th 981, 986 (9th Cir. 2021).

a

As for inaccurate disclosures, the district court held that CDCR violated due process by (1) failing to provide inmates "with adequate notice of the charges and evidence against them" and (2) failing "to disclose non-sensitive information or evidence that class members could have used to mount a defense at their disciplinary hearings." *Ashker III*, 2021 WL 5316414, at *17–18. These holdings rested on the district court's factual findings that "disclosures provided to class members contained inaccurate information or failed to disclose relevant and non-sensitive exculpatory information derived from confidential sources." *Id.* at *18. In "many instances," the district court found, the "disclosure forms attributed to confidential informants statements that the confidential informants did not actually make." *Id.* at *16.

---

[4] The parties do not dispute that the Inmates have a liberty interest in avoiding SHU placement. *See Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987) (per curiam) ("The parties do not discuss and we assume that [the plaintiff] has a protected liberty interest in not being subject to disciplinary segregation.").

The district court provided three examples that it found were "representative of the evidence" presented. *Id.* at *16–17.

We review the district court's factual findings for clear error. *Parsons*, 949 F.3d at 453. "A factual finding is clearly erroneous if it 'is illogical, implausible, or without support in inferences that may be drawn from the record.'" *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1133 (9th Cir. 2021) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

i

We start with the district court's holding that CDCR's inaccurate disclosures of confidential information violate *Wolff*'s notice requirement. *See* 418 U.S. at 564. When determining the extent of notice required, we must "remember 'the legitimate institutional needs of assuring the safety of inmates and prisoners' and avoid 'burdensome administrative requirements that might be susceptible to manipulation.'" *Zimmerlee*, 831 F.2d at 188 (quoting *Superintendent v. Hill*, 472 U.S. 445, 454–55 (1985)).

Our circuit has not expounded on the specificity of notice required under *Wolff*. *See id.* ("*Wolff* provides little guidance as to the specificity of notice necessary to satisfy due process."). Notice satisfying due process, the Second Circuit held, "need not painstakingly detail all facts relevant to the date, place, and manner of charged inmate misconduct; it must simply permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Elder v. McCarthy*, 967 F.3d 113, 128 (2d Cir. 2020) (cleaned up).

Again, the district court identified three examples "which are representative of the evidence that [the Inmates]

have presented" involving discrepancies between the confidential memoranda and the disclosure forms given to inmates. *Ashker III*, 2021 WL 5316414, at \*17. "[B]ased on the[se] examples," the district court held that the Inmates had shown due process violations arising out of CDCR's failure to provide accurate summaries of confidential information. *Id.* Reviewing for clear error, we uphold the district court's finding that these three examples are representative of the evidence presented and also evaluate the Inmates' claim based on these examples. *See Parsons*, 949 F.3d at 453. Unlike the district court, however, we conclude that *Wolff*'s notice requirement was satisfied in these examples.

In the first example, the disclosure form detailed that two confidential informants said the accused inmate wanted another inmate killed. *Ashker III*, 2021 WL 5316414, at \*16. The disclosure form stated that the planned killing was because the other inmate had not provided the accused inmate with his portion of contraband proceeds. *Id.* But the confidential memorandum stated that one of the two confidential informants gave a different reason why the accused inmate wanted the other inmate killed. *Id.*

In the second example, four inmates were accused of conspiring to murder another inmate. *Id.* at \*16–17. According to the confidential memorandum, an informant told prison authorities that "there is a possibility" the four inmates would order the murder of the other inmate, though the four inmates had not yet determined what to do. Here, the district court clearly erred in finding that "the disclosure forms failed to disclose to the four prisoners that the confidential informant stated that the inmate who was the alleged victim of the murder conspiracy had <u>not</u> been ordered murdered by the four co-conspirators." *See id.* at

\*16.    The disclosure form *did* convey the informant's uncertainty by stating that the other inmate's "fate was still in the process of being deliberated."  At most, the disclosure form exaggerated the informant's confidence by stating that "it was almost certain that [the other inmate] would be [ordered killed]," when the informant only said that "there is a possibility" that he would be killed.

In the third example, the accused inmate had allegedly been identified in a confidential note as ordering an attack against two other inmates.  *Id.* at \*17.  The disclosure form only said that the accused inmate was identified.  *Id.*  It did not disclose that the accused inmate was identified by a nickname without connecting the accused inmate to that nickname.  *Id.*

We conclude that even with the discrepancies, these inmates were "inform[ed] . . . of the charges and [enabled] to marshal the facts and prepare a defense."  *See Wolff*, 418 U.S. at 564.   Each inmate received notice "sufficiently specific as to the misconduct with which [he was] charged to inform [him] of what he [wa]s accused of doing so that he c[ould] prepare a defense to those charges and not be made to explain away vague charges."  *See Elder*, 967 F.3d at 128 (internal quotation marks and citations omitted).  In the first example, the accused inmate had notice that an informant said the accused inmate ordered another inmate's murder, even if the notice partially misstated his alleged motivation for ordering the murder.  *Ashker III*, 2021 WL 5316414, at \*16.  In the second example, the four accused inmates had notice that an informant said they were deliberating a potential murder, even if the notice exaggerated the likelihood.  *Id.* at \*16–17.  In the third example, the accused inmate had notice that a confidential note identified him as

ordering an attack on other inmates, even if the notice failed to state that he was identified by a nickname. *Id.* at *17.

In each example, the discrepancy between the confidential memorandum and the disclosure form did not deprive the inmate of notice of the charges against him and the ability to defend against those charges. *See Wolff*, 418 U.S. at 564. That is all that notice requires under *Wolff*—it does not require disclosure of every piece of evidence that might provide a basis for "challeng[ing] or otherwise rais[ing] questions as to the reliability of confidential information that could have been or was used against [inmates] during their disciplinary proceedings," as the district court concluded. *Ashker III*, 2021 WL 5316414, at *17; *see also Elder*, 967 F.3d at 128 ("The notice given need not painstakingly detail all facts relevant to the date, place, and manner of charged inmate misconduct." (cleaned up)).

We have cautioned that when "identifying the safeguards due process requires in this context, courts should remember 'the legitimate institutional needs of assuring the safety of inmates and prisoners' and avoid 'burdensome administrative requirements that might be susceptible to manipulation.'" *Zimmerlee*, 831 F.2d at 188 (quoting *Hill*, 472 U.S. at 454–55). Assuring the safety of inmates and prisoners sometimes requires prison officials to rely on confidential information in disciplinary proceedings. To balance the safety of informants and other inmates with the due process rights of accused inmates, CDCR provides accused inmates with disclosure forms summarizing the confidential information against them. *See* Cal. Code Regs. tit. 15 § 3321(b)(3). Summarizing and synthesizing information inherently includes some omissions and generalizations. To hold that anything less than complete accuracy and precision in those summaries violates due

process would impose a "burdensome administrative requirement[] that might be susceptible to manipulation." *See Zimmerlee*, 831 F.2d at 188 (quoting *Hill*, 472 U.S. at 454–55).

To be sure, intentional misrepresentation of evidence and material mischaracterization would raise due process concerns. *See Edwards v. Balisok*, 520 U.S. 641, 647 (1997) ("The due process requirements for a prison disciplinary hearing are in many respects less demanding than those for criminal prosecution, but they are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence of innocence."). But there is no evidence of that here. The inconsistencies identified by the district court reveal inaccuracies ranging from the exaggerated to the inconsequential. *See Ashker III*, 2021 WL 5316414, at *16–17. The accused inmates in the examples received the notice required by *Wolff*. *See* 418 U.S. at 564. Thus, the Inmates have not established by a preponderance of the evidence that CDCR is systemically violating *Wolff*'s notice requirement.

ii

Next, we turn to the district court's holding that CDCR's inaccurate disclosures of confidential information violate inmates' due process right to access evidence. *See Ashker III*, 2021 WL 5316414, at *17. The Inmates rely on *Melnik*, 14 F.4th at 986, to contend that "when a prisoner is provided a fabricated summary of the confidential evidence, he is denied access to the evidence the hearing officer will consider, and thus has lost the opportunity to defend himself or challenge reliability within the hearing."

*Melnik* involved an inmate who faced discipline for allegedly smuggling drugs into the prison, after prison

officials intercepted two envelopes addressed to him containing drugs. *Id.* at 984. Before his disciplinary proceeding, the inmate repeatedly asked to examine the envelopes but was not allowed to do so. *Id.* At the disciplinary hearing, "images of the envelopes and information about their contents were the only evidence presented to support the charges" and the inmate was found guilty. *Id.*

We held that the inmate had a constitutional "right to access evidence that he might use in preparing or presenting his defense," thus giving him the right to access the envelopes (or copies) that were withheld from him. *Id.* at 986–87. But "a prisoner's right to access and prepare evidence for a disciplinary hearing is not unlimited nor unfettered. It may be limited by prison officials if they have a 'legitimate penological reason.'" *Id.* at 986 (quoting *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992)). Prison officials may deny access to evidence if it would "be unduly hazardous to institutional safety or correctional goals." *Id.* at 986–87 (quoting *Wolff*, 418 U.S. at 566). Of course, "[t]he penological reason must be legitimate" and "not merely pretense or pretext." *Id.* at 987. And "administrative efficiency is not an adequate justification for denying a prisoner access to evidence to be used in forming his defense." *Id.*

The Inmates have not shown a violation of their due process right to access evidence. *See id.* at 986. The inmate in *Melnik* was denied access to "the only evidence presented to support the charges" when preparing his defense. *Id.* at 987–98. Here, by contrast, the inmates in the district court's three examples received confidential disclosure forms summarizing the evidence used against them. *Ashker III*, 2021 WL 5316414, at *16–17. This is not a case about

inmates who sought evidence that the prison refused to turn over.  *See Melnik*, 14 F.4th at 987–88.

The Inmates argue that CDCR effectively withholds evidence by misrepresenting confidential information in the disclosure forms.  But as discussed, the summaries provided are largely accurate.  Moreover, any discrepancies between the confidential memoranda and the disclosure forms here, even if characterized as withheld evidence, are minor and do not violate the right set forth in *Melnik* because legitimate penological reasons warrant limiting an inmate's access to confidential information.  *Id.* at 986.  Access may be denied "[i]f granting a prisoner access to the requested evidence would 'be unduly hazardous to institutional safety or correctional goals.'"  *Id.* at 986–87 (quoting *Wolff*, 418 U.S. at 566).

Safeguarding confidential and sensitive information is a legitimate penological reason for limiting inmates' access to evidence.  *See id.*  Recall that in the *Wolff* notice context, institutional safety and correctional goals inform the degree of notice required by due process.  *Zimmerlee*, 831 F.2d at 188.  Similar concerns inform whether legitimate penological reasons justify limiting access to evidence. *Melnik*, 14 F.4th at 986–87.  The Supreme Court has instructed that when "identifying the safeguards required by due process," courts must be conscious of "the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation."  *Hill*, 472 U.S. at 454–55.  We heed this instruction and "will not get into the business of telling state prison officials how best to protect the inmates they are charged with keeping safe." *Johnson v. Ryan*, 55 F.4th 1167, 1191 (9th Cir. 2022).

Once again, summarizing information to ensure the safety of confidential informants, other inmates, and prison personnel necessarily requires generalizations and omissions. Assuring confidentiality is not as simple as removing the confidential informant's name and other identifying information. *See Wolff*, 418 U.S. at 562 ("The reality is that disciplinary hearings . . . necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. . . . [T]he basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake . . . ."); *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Dawson v. Smith*, 719 F.2d 896, 899 (7th Cir. 1983) (deferring to prison officials' judgment concerning confidential information disclosure and concluding that "we leave it to prison officials to make judgments in these sensitive matters; as all too often they happen to be matters of life and death" (cleaned up)). The Constitution does not require prison officials to disclose every piece of information that an inmate might use in support of his defense, such as minor and immaterial inconsistencies that may "raise questions as to the reliability of confidential information." *See Ashker III*, 2021 WL 5316414, at \*17; *see also Melnik*, 14 F.4th at 986–97; *Dawson*, 719 F.2d at 899.

We reiterate that if prison officials deny or limit an inmate's access to evidence for penological reasons, those reasons cannot be "mere[] pretense or pretext." *Melnik*, 14 F.4th at 987. Overt evidence that officials intentionally

misrepresented confidential information would raise due process concerns. *See Edwards*, 520 U.S. at 647.

But such evidence is not present here. The Inmates point to nothing showing an intent to misrepresent. The record shows that CDCR provided disclosure forms and any discrepancies between the disclosure forms and the confidential memoranda were minor and immaterial. CDCR's disclosure forms in the district court's examples satisfy due process because providing confidential evidence to inmates in summary form is justified by legitimate penological reasons. *See Melnik*, 14 F.4th at 986–87. Thus, the Inmates have not established by a preponderance of the evidence that CDCR is systemically violating *Melnik*'s access-to-evidence requirement.

Because the inaccuracies and omissions in CDCR's disclosure forms identified by the district court do not violate the Inmates' due process rights, *see Wolff*, 418 U.S. at 564–66, the alleged insufficient confidential disclosure forms do not demonstrate "current and ongoing systemic violations of . . . the Due Process Clause." Thus, these allegations do not justify extending the Settlement Agreement.

b

The district court also identified "many instances in which [CDCR] relied upon confidential information without first establishing its reliability as required by *Zimmerlee*." *Ashker III*, 2021 WL 5316414, at *19–20. In *Zimmerlee*, 831 F.2d at 186–87, we addressed the evidentiary standard set by the Supreme Court for disciplinary hearings: prison disciplinary "[f]indings that result in the loss of liberty will satisfy due process if there is some evidence which supports the decisions of the disciplinary board." *Id.*; *see also Hill*, 472 U.S. at 455. That means that along with *Wolff*'s other

requirements, prison disciplinary determinations must be supported by "some evidence." *Edwards*, 520 U.S. at 648. We then held that for confidential information to constitute "some evidence" under this standard, the hearing officer must establish and record the evidence's reliability to avoid a due process violation. *Zimmerlee*, 831 F.2d at 186–87 (setting forth methods by which a hearing officer may establish the reliability of confidential information).

Once again, the district court cited examples that it found "representative of the evidence that [the Inmates] have presented." *Ashker III*, 2021 WL 5316414, at \*20. The district court found that the examples showed hearing officers assuming without verifying that confidential information is reliable, hearing officers refusing to allow prisoners to ask questions about the reliability of confidential informants, and confidential information being found corroborated by other sources when those sources did not in fact provide corroboration. *Id.* at \*19. The district court concluded that, based on these examples, the Inmates "have shown ongoing and systemic due process violations arising out of [CDCR's] failure to conduct the reliability determinations required by *Zimmerlee* before relying on evidence provided by confidential informants." *Id.* at \*20.

The district court erred by holding that insufficient reliability determinations alone violate due process. In *Zimmerlee*, we held that a prison disciplinary determination violates due process when it is "derived from" confidential information that is unreliable. 831 F.2d at 186. That is, unreliable confidential information cannot qualify as "some evidence." *See id.* But it is the lack of "some evidence" that violates due process—not necessarily the lack of sufficient reliability determinations alone. *See id.* If the disciplinary determination is supported by "some evidence," the due

process evidentiary standard is satisfied.  *See id.*  And that holds true even if other confidential information has not been found reliable.

The Inmates have not demonstrated that CDCR systemically finds inmates guilty in disciplinary hearings without "some evidence" to support its determinations.  *See id.*  Recall that the Settlement Agreement placed the burden of proof on the Inmates.  The Inmates must demonstrate a current and ongoing systemic due process violation by a preponderance of the evidence to extend the Settlement Agreement.

The Inmates have not carried this burden.  The examples they cite show that CDCR's reliability determinations are usually sufficient because officials established reliability under *Zimmerlee*.  *See id.* ("Review of . . . the reliability determination . . . should be deferential.").  Regardless, the Inmates have not shown by a preponderance of the evidence that CDCR's disciplinary determinations are systemically unsupported by "some evidence"—a "minimally stringent" standard requiring only that "there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board."  *See Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) (quoting *Hill*, 472 U.S. at 455–56).  The lack of reliability determinations alone does not violate due process.  *See Zimmerlee*, 831 F.2d at 186.

\*\*\*

The Inmates' Confidential Information Claim does not allege a current and ongoing systemic violation of the due process clause.  Thus, it cannot justify extension of the Settlement Agreement.

B

The district court also extended the Settlement Agreement based on the Inmates' Parole Claim. *Ashker III*, 2021 WL 5316414, at \*20–23. The district court determined that inmates are systemically denied due process because CDCR continues to rely on flawed gang validations when evaluating inmates' eligibility for parole. *Id.* at \*23. We disagree with the district court. The Parole Claim is an improper basis for extending the Settlement Agreement and does not demonstrate a due process violation.[5]

1

CDCR contends that the Parole Claim is an improper basis for extending the Settlement Agreement because it is neither alleged in the Complaint nor a result of CDCR's reforms to its Step Down Programs or SHU policies. The district court concluded otherwise, holding that the Parole Claim was alleged in the Inmates' Complaint. *Ashker III*, 2021 WL 5316414, at \*21. Interpreting the Settlement Agreement de novo to determine whether it authorizes extension based on the Parole Claim, *see Ashker II*, 968 F.3d at 944, we disagree with the district court. The paragraphs of the Complaint that the district court relied on allege an unwritten policy preventing anyone in SHU from receiving parole, that the denial of parole deprives inmates of a basic human need, and that CDCR's "SHU policies and practices are atypical in effectively prolonging incarceration, in that prisoners in the SHU are . . . rendered functionally ineligible for parole." *See Ashker III*, 2021 WL 5316414, at \*21.

---

[5] CDCR also argues that the Inmates are judicially estopped from making the Parole Claim. Though CDCR's judicial estoppel argument is persuasive, we resolve this issue on other grounds.

Those allegations differ from the Parole Claim, which argues "that [CDCR's] retention of the old gang validations in their system without adding any qualifications to indicate to the Parole Board that they are unreliable has deprived class members of a fair opportunity for parole." *Id.* at *20. The Complaint does not allege a due process violation based on CDCR's failure to flag faulty gang violations for the parole board. Again, the Settlement Agreement carefully limits the bases for extending the monitoring period. The "clear and explicit meaning" of the Settlement Agreement's provisions controls our interpretation and provides that only due process violations alleged in the Complaint or resulting from the Step Down Program or SHU reforms justify extension. *See Continental Ins.,* 281 P.3d at 1004. The Inmates cannot obtain an extension by alleging due process violations that have some peripheral relation to the allegations in the Complaint.**[6]**

2

The Parole Claim also does not justify extension because it does not allege a current and ongoing systemic due process violation. The district court held that CDCR's "continued retention and use of old gang validations without any acknowledgement of the fact that they are flawed and unreliable gives rise to violations of class members' right to a meaningful hearing in the context of parole." *Ashker III*, 2021 WL 5316414, at *23. But the district court imposed due process requirements that the Constitution does not.

---

[6] We also reject the Inmates' alternative argument that the Parole Claim results from the Settlement Agreement's reforms to its Step Down Program or SHU policies. The district court did not adopt this argument and the Inmates point to no provision of the Settlement Agreement to support their argument.

In *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 16 (1979), the Supreme Court addressed the procedural due process required in parole proceedings.[7]  The Court held that "an opportunity to be heard, and when parole is denied [informing] the inmate in what respects he falls short of qualifying for parole . . . affords the process that is due." *Id.*  The Court held that "[t]he Constitution does not require more." *Id.*

The Court reiterated this holding in *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (per curiam).  "In the context of parole, we have held that the procedures required are minimal." *Id.*  The Court then determined that the California habeas petitioners in that case received an opportunity to be heard and a statement of the reasons why parole was denied. *Id.*  "That should have been the beginning and the end of the . . . inquiry into whether [the petitioners] received due process." *Id.*  We, too, have underscored that when the *Greenholtz* procedures are employed, "that is the end of the matter for purposes of the Due Process Clause." *Roberts v. Hartley*, 640 F.3d 1042, 1046 (9th Cir. 2011).

The district court did not heed this instruction.  It concluded that CDCR's prior procedures for generating gang validations and the resulting gang validations themselves violated the Constitution. *Ashker III*, 2021 WL 5316414, at *22.  It then held that these deficiencies deprived inmates of due process because the parole board considers these flawed validations, depriving inmates of a "meaningful hearing." *Id.* at *22–23.

---

[7] The parties do not dispute that the Inmates have a liberty interest in parole. *See Pearson v. Muntz*, 639 F.3d 1185, 1190–91 (9th Cir. 2011).

The district court added due process requirements contrary to the Supreme Court's holding that "[t]he Constitution does not require more." *See Greenholtz*, 442 U.S. at 16. There is no evidence that the *Greenholtz* requirements were not satisfied here.

The Inmates maintain that they allege a different kind of due process violation. They argue it is not the parole board considering prior gang validations that violates due process, but that CDCR is obstructing meaningful access to the parole process by recklessly or deliberately providing the parole board with unconstitutional gang validations. The Inmates rely on *Benavidez v. County of San Diego*, 993 F.3d 1134, 1152 (9th Cir. 2021), and *Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1108 (9th Cir. 2010), arguing that "a party extrinsic to an administrative or judicial proceeding who recklessly or deliberately misrepresents the facts to the decision-making body can be liable for violating the Constitution regardless of whether the decision-maker is also subject to suit."

These cases are not on point. Both hold that deliberately fabricating evidence in child custody proceedings violates due process. *Benavidez*, 993 F.3d at 1152; *Costanich*, 627 F.3d at 1108. "Precisely what procedures the Due Process Clause requires in any given case is a function of context." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998). The context of civil child custody cases is meaningfully different from the prison parole context. The Inmates do not explain why the same due process procedures that apply in child custody cases should be imported here.

Even if an analogous claim could lie in the prison parole context, there is no deliberate or reckless fabrication of

evidence here.  *See Benavidez*, 993 F.3d at 1152; *Costanich*, 627 F.3d at 1108.  CDCR merely provided the parole board with the existing gang validation information it had.  The district court concluded that CDCR's prior validation process and the resulting validations were illegitimate—a conclusion on which we express no view.  *See Ashker III*, 2021 WL 5316414, at \*22.  But even if the prior process and resulting validations were deficient, CDCR did not provide gang validations to the parole board recklessly or deliberately because CDCR had no reason to doubt the validations' reliability.  The Settlement Agreement states that CDCR made no "admission or concession . . . of any current and ongoing violations of a federal right."  And the parties told the district court that the Settlement Agreement "does not contemplate the 'exoneration' of past validations." Before the district court concluded that CDCR's previous validation process was flawed, *id.*, no court had reached that conclusion.  Indeed, we have previously held that CDCR's validation of inmates satisfies due process when accompanied by certain minimum procedures.  *See*, *e.g.*, *Bruce v. Ylst*, 351 F.3d 1283, 1287–88 (9th Cir. 2003) (upholding validation of an inmate housed at Pelican Bay). Thus, CDCR did not misrepresent or omit information to the parole board deliberately or with reckless disregard for the truth by failing to somehow signify that the validations were defective.[8]  *See Benavidez*, 993 F.3d at 1147; *Costanich*, 627 F.3d at 1108.

---

[8] We likewise reject the Inmates' argument that the parole process is subject to systemic bias.  The Inmates have not shown that the parole board was biased or prejudiced.  *See O'Bremski v. Maass*, 915 F.2d 418, 422 (9th Cir. 1990).

\*\*\*

The Inmates' Parole Claim does not allege a current and ongoing systemic violation of the due process clause. Thus, it cannot justify extension of the Settlement Agreement.

## C

The Inmates' RCGP claim is the third basis the district court relied on for extending the Settlement Agreement. *Ashker III*, 2021 WL 5316414, at \*5–13. The Inmates contend that CDCR violates the Inmates' due process rights by placing them in the RCGP—a new unit created by the Settlement Agreement for housing inmates with safety concerns. Unlike the first two claims, there is no dispute that the RCGP Claim results from CDCR's Step Down Program or SHU reforms. *See id.* at \*6. The district court held (1) that there is a liberty interest in avoiding RCGP placement and (2) that CDCR's procedures for placing inmates in the RCGP are insufficient because CDCR fails to provide meaningful notice or periodic review. *Id.* at \*10, 12. We disagree on both counts.

## 1

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). To show a due process violation, the Inmates must establish a liberty interest in avoiding RCGP placement. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Though "[t]he Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, [] such an interest may 'arise from state policies or

regulations.'" *Johnson*, 55 F.4th at 1180 (quoting *Wilkinson*, 545 U.S. at 221–22). An interest in avoiding certain conditions of confinement constitutes a liberty interest protected by the Due Process Clause if the challenged condition "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

Though there "is no single standard" for determining when circumstances are atypical and significant, we have detailed three guiding considerations:

> 1) whether the challenged condition mirrored those conditions imposed upon inmates in administrative segregation and protective custody, and thus comported with the prison's discretionary authority; 2) the duration of the condition and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Id.* at 1195–96 (quoting *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003)) (internal quotation marks omitted).

We have also acknowledged inconsistency among courts in "identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Id.* at 1195 (quoting *Wilkinson*, 545 U.S. at 223); *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) ("We . . . have not clearly held that conditions in the general population, as opposed to those in other forms of administrative segregation or protective custody, form the appropriate baseline comparator."). The district court acknowledged this uncertainty about the proper baseline.

*Ashker III*, 2021 WL 5316414, at \*7.  It then concluded "that the conditions in the general prison population are the appropriate basis for comparison" because inmates who were placed in the RCGP "otherwise would have been placed in the general population."  *Id.*

In supplemental briefing addressing this question, the parties largely agreed.[9]  Both parties maintain that the proper baseline when deciding whether a challenged condition is atypical and significant is fact-specific and varies from case to case.  The parties also agree that the baseline here is Level IV general population facilities.  *See* Cal. Code Regs. tit. 15 § 3377(d).  Given the agreement between the parties, we assume that the conditions in Level IV general population facilities form the appropriate baseline comparator here.

Using this baseline, we address whether the conditions of the RCGP are atypical and significant.  *See Sandin*, 515 U.S. at 484.  Recall that the RCGP was "designed to provide increased opportunities for positive social interaction with other prisoners and staff," including educational opportunities, out-of-cell time in small group yards, religious services, job assignments, leisure time activity groups, and contact visits from family members—all without the use of mechanical restraints.

All inmates who enter the RCGP are initially placed on walk-alone status—an orientation and observation period to determine whether an inmate can program safely with others.  After this period, an inmate appears before the ICC, which determines whether the inmate can be safely placed in a programming group with other RCGP inmates.  If the ICC

---

[9] Along with their supplemental brief, the Inmates moved to file supplemental excerpts of record under seal.  We grant the motion.

does not find that the inmate can be safely placed in a programming group, he remains on walk-alone status subject to periodic reviews that occur every six months. Like general placement in the RCGP, an inmate remains on walk-alone as long as CDCR determines it is necessary, and an inmate may remain on walk-alone status for his entire time in the RCGP.

Inmates on walk-alone status experience increased restrictions compared to other RCGP inmates, but they retain several privileges. In declarations, inmates state that walk-alone inmates can exercise for two hours a day in fenced, outdoor enclosures without exercise equipment. During that time, they can speak to other walk-alone inmates also exercising in separate enclosures. Walk-alone inmates can also visit the "dayroom" one to three times per week for about one hour. During dayroom time, walk-alone inmates may talk to other inmates from outside their cell doors. They also have opportunities for 15-minute phone calls and educational programming, though the programming is limited to self-study with some teacher contact. Walk-alone inmates have access to a law library kiosk and the "canteen" (store) is brought to them once a month.

These inmate declarations track RCGP Captain J. Berg's declaration. Captain Berg states that "[i]nmates on walk-alone status have access to educational opportunities, yard and out-of-cell time commensurate with the general population, religious services, job assignments, leisure time opportunities, and privileges like canteen and non-contact visits, and telephone calls." Further, "[a]ll RCGP inmates receive a housing review every six months" and "[s]eparate from those periodic reviews," walk-alone inmates can "inform[] staff that [they] can safely program with [general RCGP] inmates" and the "staff evaluates the request at that

time." They can receive work assignments that "take inmates out of their cells as much as six-and-one-half hours a day" and "present opportunities for further interaction with other inmates and staff." Captain Berg testifies that RCGP conditions are "very similar" to his experience in "Pelican Bay's Level IV general-population housing unit."

Because all RCGP inmates are initially placed on walk-alone status with no predetermined end date, we consider both general RCGP conditions and walk-alone conditions in our liberty interest analysis. The first guidepost directs us to consider whether RCGP conditions mirror those in administrative segregation and protective custody, "and thus comport[] with the prison's discretionary authority."[10] *Ramirez*, 334 F.3d at 861. California regulations describe the conditions of administrative segregation.[11] Cal. Code Regs. tit. 15 § 3343. In many ways, the conditions of

---

[10] As discussed, we assume here that the conditions of Level IV general population facilities are the baseline when determining whether RCGP conditions are atypical and significant. That said, our precedent still directs us to consider the conditions of administrative segregation and protective custody. *Ramirez*, 334 F.3d at 861; *see also Chappell v. Mandeville*, 706 F.3d 1052, 1064 (9th Cir. 2013) ("[A]t least" these three guideposts "should be considered in each case[.]"). This makes sense because even if Level IV general population facilities are the primary baseline, administrative segregation and protective custody are forms of confinement that a prison has discretion to impose. *See Chappell*, 706 F.3d at 1064–65. The conditions of these "discretionary confinement settings" should inform the atypical-and-significant analysis even if those conditions are not the primary baseline comparator. *See id.* at 1064; *Sandin*, 515 U.S. at 486 ("Conner's confinement did not exceed similar, but totally discretionary, confinement . . . .").

[11] In this case, we assume that the conditions of "administrative segregation" and "protective custody" are equivalent. *See Pierce v. County of Orange*, 526 F.3d 1190, 1196 n.3 (9th Cir. 2008).

administrative segregation are like those of the general population. *See id.* § 3343(a). The regulations state that inmates in administrative segregation are permitted non-contact visits, *id.* § 3343(f), "a minimum of one hour per day, five days a week, of exercise outside of their rooms or cells unless security and safety considerations preclude such activity," *id.* § 3343(h), "[l]ibrary services" representing "a cross-section of material available to the general population," *id.* § 3343(i), telephone calls with supervisor approval, *id.* § 3343(j), and "access to such programs and services as can be reasonably provided within the unit without endangering security or the safety of persons," *id.* § 3343(k).

Walk-alone conditions mirror these conditions. As discussed, walk-alone inmates receive similar daily exercise time and opportunities for programs and services. The district court focused on the fact that contact visits for RCGP inmates are limited to weekdays and concluded that this restriction is atypical. *Ashker III*, 2021 WL 5316414, at *8. The district court also noted the diminished opportunities for socializing and programming provided to walk-alone inmates. *Id.* at *9. But these limitations do not impose atypical and significant hardship. In *Johnson*, we stressed that restrictions constituting atypical and significant hardship should cause a "material change in the underlying conditions of [an inmate's] confinement," with "incidental, fleeting benefits" such as "a two-person recreation period, favorable job assignments, unrestrained meals, unrestrained walks and access to the showers and recreation areas, or access to a GED program" failing to rise to that level. 55 F.4th at 1196 (emphasis omitted). Receiving fewer contact visits than other inmates does not constitute "a beyond-standard deviation from the ordinary circumstances of prison

life." *See id.*; *see also Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002) (en banc) ("[I]t is well-settled that prisoners have no constitutional right while incarcerated to contact visits . . . ."). Likewise, RCGP inmates receive multiple opportunities for socializing and programming. The limitations on these privileges are not atypical and significant compared to administrative segregation. *See* Cal. Code Regs. tit. 15 § 3343.

The second guidepost is "the duration of the condition, and the degree of restraint imposed." *Ramirez*, 334 F.3d at 861. We addressed this balance in *Brown*, and held that an inmate's twenty-seven-month confinement in the Intensive Management Unit, or "IMU," which "subjected [the inmate] to solitary confinement for over twenty-three hours each day with almost no interpersonal contact, and denied him most privileges afforded inmates in the general population" gave rise to a liberty interest. 751 F.3d at 988. We also observed that the inmate "was given a fixed and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the limited period of confinement with periodic review afforded inmates in [the Oregon prison system's] other segregated-housing units." *Id.*

Conditions in the RCGP are far removed from those in *Brown*. As to the "duration of the condition," RCGP placement and walk-alone status are designed as "limited period[s] of confinement with periodic review," not "fixed and irreducible period[s] of confinement." *See id.* at 987–88. Still, there is no maximum term of confinement, and the duration of confinement is a "crucial factor." *Id.* at 988.

But here, the potential duration of confinement is offset by the minimal "degree of restraint imposed" on inmates in the RCGP. *See id.* at 987. Even RCGP walk-alone

conditions are significantly less severe than the IMU conditions addressed in *Brown*. *See id.* at 987–88. Unlike the IMU inmate who was held in "solitary confinement for over twenty-three hours each day with almost no interpersonal contact" and denied "most privileges afforded inmates in the general population," *id.* at 988, inmates on walk-alone status receive two hours of daily exercise, the opportunity to talk with other inmates, dayroom visits, phone calls, and programming such as educational opportunities, a law library kiosk, and access to the canteen.

"[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. at 472. Thus, on balance, the "duration of the condition" and the "degree of restraint imposed" do not suggest that the RCGP imposes atypical and significant hardship compared to Level IV general population facilities. *See Brown*, 751 F.3d at 987. Indeed, we previously held that the limitations of walk-alone status "are only minor deviations" from what the Settlement Agreement required. *Ashker II*, 968 F.3d at 945–46. The restrictions the district court and the Inmates rely on—contact visits limited to weekdays, no maximum term of confinement, and walk-alone status—"do not represent a beyond-standard deviation from the ordinary circumstances of prison life." *Johnson*, 55 F.4th at 1196.

Considering the third guidepost, RCGP placement will not "invariably affect the duration of the prisoner's sentence." *Ramirez*, 334 F.3d at 861. The district court determined "that diminished opportunities for programming . . . can negatively impact inmates' eligibility for parole . . . which in turn can lengthen the duration of inmates'

sentences." *Ashker III*, 2021 WL 5316414, at \*9.  But our question is "whether the state's action will *invariably* affect the duration of the prisoner's sentence." *Ramirez*, 334 F.3d at 861 (emphasis added).  Even if RCGP placement can have a potential negative effect on parole eligibility, it does not "invariably" lengthen the sentence of RCGP inmates. *See id.*

We conclude that RCGP placement, including walk-alone status, does not "impose[] atypical and significant hardship on the [I]nmate[s] in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484.  This holding tracks our recent opinion in *Johnson*.  In that case, the inmate asserted several liberty interests.  First, we addressed whether the inmate had "a liberty interest in avoiding maximum security confinement in the Browning Unit."  55 F.4th at 1180; *see also id.* at 1197–98 (addressing the related question of whether the inmate "stated a liberty interest in avoiding a return to maximum custody from close custody").  The inmate alleged that "he is confined to his cell for twenty-four hours per day, strip searched every time he leaves his cell, takes meals in his cell, and has limited access to rehabilitation programs." *Id.* at 1180; *see also id.* at 1198 (maximum custody also "permits inmates a maximum of three phone calls per week, three non-contact visits per week . . . three three-hour recreation opportunities per week," and requires "single-cell housing, [being] escorted in full restraints any time [inmates] move within the institution . . . frequent[] monitor[ing], and . . . only limited work opportunities within the secure perimeter").  The inmate also alleged that he was "denied the opportunity for restoration of lost earned release credits." *Id.* at 1180.  We concluded that these conditions imposed atypical and significant hardship and held that the inmate had a liberty interest in

avoiding these maximum security conditions.  *Id.*; *see also id.* at 1198.

Second, we addressed whether the inmate had a liberty interest in participating in the Arizona prison system's step down program, or "SDP."  *Id.* at 1194.  We concluded that the inmate did not have a liberty interest because "[t]he inmate removed from SDP has only lost access to one of several procedures by which he might change his conditions of confinement, and that alone is insufficient to create a liberty interest independent of any underlying change to [the inmate's] conditions."  *Id.* at 1195.  We also held that removal from the first three phases of the SDP did "not result in any significant change in an inmate's conditions of confinement" because nothing "in our cases would suggest that denying an inmate a two-person recreation period, favorable job assignments, unrestrained meals, unrestrained walks and access to the showers and recreation areas, or access to a GED program rises to the level of an 'atypical or significant hardship.'"  *Id.* at 1195–96.

The conditions of RCGP walk-alone status are more like the first three phases of the SDP than maximum security confinement in the Browning unit.  As described above, walk-alone status conditions are less restrictive than the conditions of maximum security confinement in *Johnson*. *See id.* at 1180, 1198.  The privileges that are limited by RCGP walk-alone status are like those privileges we described as "incidental, fleeting benefits" that do "not introduce an 'atypical and significant hardship' that would trigger a liberty interest."  *See id.* at 1196.

"Not every transfer accompanied by marginally harsher conditions creates a liberty interest."  *Id.*  That is the case here because the conditions of the RCGP and walk-alone

status do not impose "atypical and significant hardship" on inmates "in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484.  "[T]ransfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."  *Johnson*, 55 F.4th at 1196 (quoting *Hewitt*, 459 U.S. at 468).  So the Inmates have not established a liberty interest.

2

Further, the Inmates' RCGP Claim would not justify extending the Settlement Agreement even if the Inmates had a liberty interest in avoiding RCGP placement.  That is because CDCR employs constitutionally sufficient procedural protections when placing inmates in the RCGP.

To determine whether procedures provide sufficient due process, we evaluate (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of additional or substitute safeguards; and (3) the government's interest.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  For prison housing placement that is administrative, not disciplinary, "informal, nonadversary review" is sufficient.  *Hewitt*, 459 U.S. at 476.  Those procedures include notice of the reason for confinement, an opportunity to be heard, and periodic review.  *Id.* at 476 & 477 n.9.

The district court held that CDCR's RCGP placement procedures fell short of this standard because CDCR failed to provide meaningful notice or periodic review.  *Ashker III*, 2021 WL 5316414, at *11.  The Inmates rely on these same purported shortcomings to argue that the RCGP placement procedures are constitutionally deficient.  We review these arguments within the three-factor framework established by *Mathews*.  424 U.S. at 335.

The first and third *Mathews* factors—the balance of inmate private interests and the governmental interest—weigh in CDCR's favor. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. When an inmate is "merely transferred from one extremely restricted environment to an even more confined situation," the inmate's private interest "is not one of great consequence." *Hewitt*, 459 U.S. at 473. By contrast, the government-interest factor is a "dominant consideration" in "the context of prison management," because "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227. The government's interest is of "great importance" because the "safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt*, 459 U.S. at 473. Thus, the first and third *Mathews* factors favor CDCR here.

The second *Mathews* factor also weighs in CDCR's favor. The district court held that CDCR's procedures for RCGP placement risked an erroneous deprivation because they provided insufficient notice and periodic review. *Ashker III*, 2021 WL 5316414, at *11. As to notice, the district court found that CDCR "relied on findings that releasing prisoners to the general population would pose a threat to the safety of the institution even though [the Settlement Agreement] does not contemplate the safety of the institution as a reason for keeping prisoners in the RCGP." *Id.* The district court also found that "CDCR told prisoners that participating in programming and remaining

incident-free for six months would result in transfer out of the RCGP." *Id.* The district court concluded that this conflicted with the Settlement Agreement because it "permits Defendants to retain inmates in the RCGP only if the ICC verifies that 'there continues to be a demonstrated threat to the inmate's personal safety.'" *Id.* Indeed, the Inmates argue that CDCR "retained scores of people in RCGP despite expressly noting they had positively programmed and remained incident-free."

These findings do not risk an erroneous deprivation of RCGP inmates' rights based on insufficient notice. For one, relying on the safety of the institution to house an inmate in the RCGP fits the notice the inmates were given. The district court concluded otherwise because the Settlement Agreement states the relevant consideration to be prisoner safety and not institutional safety. *Id.* But a threat to an inmate's safety and to the institution's safety are often intertwined—a threat to an inmate endangers the safety of the institution as a whole. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." (cleaned up)).

At any rate, notice sufficient to satisfy due process does not require such granular detail. *Hewitt* involved an inmate placed in administrative segregation because prison officials determined that he could endanger the safety of others and that it was wise to separate him from the general population while his role in a prison riot was investigated. 459 U.S. at 473. The Supreme Court held that "some notice of the charges against him" was sufficient to confine him in the challenged housing conditions. *Id.* at 476–77. The Court also addressed the notice requirement in *Wilkinson*. 545 U.S. at 225–26. The policy in that case provided that "an

inmate must receive notice of the factual basis leading to consideration for [the challenged housing] placement and a fair opportunity for rebuttal." *Id.* The Court held that "[r]equiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason." *Id.* at 226.

Here, the Inmates have not shown by a preponderance of the evidence that they were given insufficient notice, that is, "a brief summary of the factual basis" for their confinement in the RCGP. *See id.* Providing inconsistent information about exactly how to return to the general population is an ignoble practice, but it does not violate the constitutional notice requirement or create a risk of erroneous placement or retention in the RCGP when the inmates were otherwise told why they were housed there. According to their declarations, inmates housed in the RCGP were given notice that they were placed there because CDCR determined there were threats to their safety. These inmates did not always agree with CDCR's assessment, but they received the notice required. *See id.*

Further, we afford CDCR significant deference on its safety determinations. "[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Hewitt*, 459 U.S. at 474 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981)); *see also id.* ("The judgment of prison officials in this context . . . turns on purely subjective evaluations and predictions of future behavior . . . indeed, the administrators must predict not just one inmate's future actions . . . but those of an entire institution." (internal quotation marks and citation omitted)). "Prison officials must strike a careful balance to determine

who must be protected from whom and for how long," thus, "[w]e will not get into the business of telling state prison officials how best to protect the inmates they are charged with keeping safe." *Johnson*, 55 F.4th at 1190–91.

As to periodic review, the district court found that "instead of evaluating whether a safety concern continues to exist, the ICC operates under what appears to be a presumption that historical threats to prisoners' safety continue to exist in the absence of affirmative evidence that the threats have abated." *Ashker III*, 2021 WL 5316414, at *11. This finding does not risk an erroneous deprivation of the Inmates' rights by depriving RCGP inmates of adequate review. "[P]eriodic reviews do not necessarily require additional evidence and may rely on facts that were ascertained when the initial decision to confine the inmate . . . was made." *Johnson*, 55 F.4th at 1185. Even if CDCR assumes that a threat exists until new evidence shows otherwise, that is no more likely to risk erroneous deprivation than relying on gang status in *Johnson*. *See id.*

As in *Johnson*, the Inmates have not shown that RCGP placement "is based on stale information or is so outdated as to be irrelevant to a current risk analysis" and that threats to the Inmates' safety have abated. *See id.* at 1188. And just as "prison officials' judgment that an inmate represents a threat to the safety of the prison may 'turn[] largely on purely subjective evaluations and on predictions of future behavior' and may be appropriate '*even if [the inmate] himself has committed no misconduct*,'" *id.* at 1187 (quoting *Hewitt*, 459 U.S. at 474), the same is true for prison officials' judgment that an inmate's own safety is at risk.

In sum, our review of the *Mathews* factors shows that CDCR's RCGP placement procedures are constitutionally

sufficient.  The Inmates have not shown by a preponderance of the evidence that inmates housed in the RCGP receive constitutionally deficient notice or periodic review that risks erroneous deprivation of inmates' rights.  *See Mathews*, 424 U.S. at 335.  We owe substantial deference to CDCR's determination that an inmate faces safety concerns. *Johnson*, 55 F.4th at 1190–91.  Also considering the balance of public and private interests, the *Mathews* factors favor CDCR.  Thus, CDCR's procedures for RCGP placement and retention do not systemically violate the Due Process Clause. *See Matthews*, 424 U.S. at 335.

\*\*\*

The Inmates' RCGP Claim does not allege a current and ongoing systemic violation of the due process clause.  Thus, it cannot justify extension of the Settlement Agreement.

## IV

We reverse the district court because the first extension of the Settlement Agreement was improper.  Given that, under the Settlement Agreement, the "Agreement and the Court's jurisdiction over this matter shall automatically terminate, and the case shall be dismissed."  The initial twenty-four-month monitoring period ended in October 2017, so the Settlement Agreement and the court's jurisdiction over the matter automatically terminated then.**[12]**

---

[12] This appeal does not require us to address any claims that the Inmates may retain based on "limited jurisdiction" under paragraph 46 of the Settlement Agreement, which provides that "[i]f there is a motion contesting [CDCR's] compliance with the terms of this Agreement pending at the time the case is otherwise terminated, the Court will retain limited jurisdiction to resolve the motion."

Because the court's jurisdiction terminated, the district court lacked jurisdiction to order a second extension of the Settlement Agreement. *See Ashker v. Newsom*, No. 09-cv-05796 CW, 2022 WL 309862 (N.D. Cal. Feb. 2, 2022) (*Ashker IV*). That order is the subject of the second appeal before us. Without jurisdiction, the district court's second extension order is null. *See Morongo Band of Mission Indians v. Cal. St. Bd. of Equalization*, 858 F.2d 1376, 1381 (9th Cir. 1988) ("If jurisdiction was lacking, then the [district] court's various orders . . . were nullities."). Thus, we vacate the district court's second extension order and dismiss the second appeal as moot.

**REVERSED in part, VACATED in part, and DISMISSED in part.**

---

R. NELSON, Circuit Judge, joined by GWIN, District Judge, concurring:

In the majority opinion, we identify the inconsistency among courts in "identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Johnson v. Ryan*, 55 F.4th 1167, 1195 (9th Cir. 2022) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)); *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) ("We . . . have not clearly held that conditions in the general population, as opposed to those in other forms of administrative segregation or protective custody, form the appropriate baseline comparator."). We also acknowledge the parties' agreement that the baseline for comparison here is Level IV general population facilities. Given the lack of dispute on the question, we assume the parties' proposed

baseline for our analysis. But I believe that is the wrong baseline for this case and for future cases.

Thus far, our court has taken a somewhat ad hoc approach without definitively resolving whether the proper baseline is the general prison population or a different form of confinement, such as administrative segregation or protective custody. *See Johnson*, 55 F.4th at 1198 (comparing the challenged conditions to the inmate's "underlying conditions of confinement"); *Brown*, 751 F.3d at 988 ("[W]e need not locate the appropriate baseline here because Brown's [confinement] imposed an atypical and significant hardship under any plausible baseline."); *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) ("*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation . . . .").

The D.C. Circuit surveyed the landscape on this question in *Aref v. Lynch*, 833 F.3d 242, 253 (D.C. Cir. 2016), noting that "lower court assessments have diverged." "The Third, Sixth, and Tenth Circuits all generally look to administrative confinement as the baseline." *Id.* (citing *Griffin v. Vaughn*, 112 F.3d 703, 706–08 (3d Cir. 1997); *Jones v. Baker*, 155 F.3d 810, 812–13 (6th Cir. 1998); *Gaines v. Stenseng*, 292 F.3d 1222, 1224–26 (10th Cir. 2002)). The Fourth Circuit, by contrast, "looks to the general population as the baseline." *Id.* at 254 (citing *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997)). The D.C. Circuit explained how the Second, Fifth, and Seventh circuits take different approaches still. "[T]he Second Circuit requires a fact-specific determination that compares the duration and conditions of segregation with conditions in both administrative confinement and the general population." *Id.* (citing *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998)). "The Fifth Circuit . . . has held

disciplinary segregation can never implicate a liberty interest unless it 'inevitably' lengthens a prisoner's sentence . . . and that administrative segregation—being an ordinary incident of prison life—is essentially incapable of creating a liberty interest." *Id.* at 253 (citing *Carson v. Johnson*, 112 F.3d 818, 821 (5th Cir. 1997); *Orellana v. Kyle*, 65 F.3d 29, 31–32 (5th Cir. 1995)). And "[t]he Seventh Circuit [holds] the baseline is not just the conditions of confinement within that particular prison, but those at the harshest facility in the state's most restrictive prison." *Id.* at 253–54 (citing *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997)). The D.C. Circuit then reaffirmed its own approach identifying administrative segregation as the proper baseline. *Id.* at 254–55.

In my view, the conditions of administrative segregation or protective custody are the proper baseline comparators when determining whether a challenged prison condition imposes atypical and significant hardship.[1] The Supreme

---

[1] Both parties suggest in their supplemental briefing that there is no single baseline from which to measure atypical and significant hardship, and that the proper baseline is fact-specific and varies case by case. For most inmates, the ordinary incidents of prison life will include the possibility of administrative segregation, making it the proper baseline. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *abrogated in part on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995). That said, the specific conditions of administrative segregation could vary from prison to prison. And for certain inmates, the ordinary incidents of prison life may deviate from the standard based on specific conditions imposed by the sentence. *See, e.g.*, *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 456 (3d Cir. 2020) (Porter, J., concurring in part and dissenting in part) (describing an inmate whose "death sentence carries with it the statutory requirement that he remain in solitary confinement," thus concluding that "solitary confinement is 'within the sentence imposed'" and "not atypical but exactly what [the inmate] could reasonably expect"). Thus,

Court held in *Sandin* that we ask whether the challenged condition "imposes atypical and significant hardship on the inmate *in relation to the ordinary incidents of prison life*." 515 U.S. at 484 (emphasis added). "[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt*, 459 U.S. at 468; *see also Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) ("[T]he Ninth Circuit explicitly has found that administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence." (quoting *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997)). Holding that the inmate in *Sandin* had no liberty interest in avoiding the challenged condition, the Supreme Court concluded that the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." 515 U.S. at 486.

Our precedent acknowledges this. In setting forth "guideposts" for determining whether a condition is atypical and significant, we have said that courts should consider "whether the challenged condition mirrored those conditions imposed on inmates in administrative segregation and protective custody." *Johnson*, 55 F.4th at 1195–96 (quoting *Ramirez*, 334 F.3d at 861) (internal quotation marks omitted).

This makes sense. Administrative segregation is a form of confinement that prison officials may impose. *Hewitt*, 459 U.S. at 468; *see also Chappell v. Mandeville*, 706 F.3d 1052, 1064–65 (9th Cir. 2013) (characterizing administrative segregation and protective custody as

---

I would leave open the possibility that the baseline could vary from case to case. *See Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

"*discretionary* confinement settings."). If the challenged condition mirrors conditions that the prison may impose without additional procedures, then the challenged condition is not atypical and significant. *See Chappell*, 706 F.3d at 1064–65; *see also Sandin*, 515 U.S. at 486 ("Conner's confinement did not exceed similar, but totally discretionary, confinement . . . ."); *Johnson*, 55 F.4th at 1196 (no liberty interest is implicated by transfers that "may be made on the basis of 'informed predictions as to what would best serve institutional security or the safety and welfare of the inmate'" (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976))). That is why we have framed our first guidepost as "whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' *and thus comported with the prison's discretionary authority*." *Ramirez*, 334 F.3d at 861 (quoting *Sandin*, 515 U.S. at 486–87) (emphasis added).

In my view, discretionary confinement such as administrative segregation and protective custody constitute the proper baseline for whether a challenged prison condition is atypical and significant.[2] *See Aref*, 833 F.3d at 253–54.

---

[2] When comparing a challenged condition to the conditions of administrative segregation or protective custody, we should also consider the typical duration of confinement in administrative segregation or protective custody. *See Sandin*, 515 U.S. at 486 ("Conner's confinement did not exceed similar, but totally discretionary, confinement *in either duration or degree of restriction*." (emphasis added)); *Aref*, 833 F.3d at 254–55. Our guideposts account for this consideration. *Ramirez*, 334 F.3d at 861 (considering "the duration of the condition, and the degree of restraint imposed").